## Case No. 2,640.

### The CHEROKEE.

[2 Spr. 235;[1] 3 Am. Law Reg. (N. S.) 289.]

District Court, D. Massachusetts. Dec., 1863.

JOINT CAPTURE OF PRIZE—CONSTRUCTIVE CAPTURE—PRIZE ACT OF 1862—CONSTRUCTION.

Joint capture of a prize. Who are entitled to share. Co-operation in a blockade does not constitute the blockading vessels joint captors. Discussion of the English doctrine of constructive captors. Construction of the prize act of 1862 [12 Stat. 606].

[Followed in The Atlanta, Case No. 619. Cited in The Aries, Id. 529; The St. John, Id. 12,225; The Selma, Id. 12,647.]

In admiralty.

R. H. Dana, Jr., U. S. Atty., for the actual captor.

No counsel appeared for any other party, but suggestions were made in communications from some of the vessels claiming as joint captors.

SPRAGUE, District Judge. The steamer Cherokee and cargo were captured on the 8th of May last by the United States ship-of-war Canandaigua, and sent into this port. They have both been condemned. The question now arises, how shall the proceeds be distributed?

It is the duty of this court to determine what ships shall participate in the proceeds of a prize; but it is the province of the secretary of the navy, under the statutes, to ascertain and decide, at least in the first instance, what persons constituted the officers and crews of such ships, and the flag officer of a squadron, and the share which each shall receive. I mention this because communications have been received, founded on the erroneous supposition that this court was to decide upon the claims of individuals as flag officers or otherwise, and it is desirable that it should be known that such claims must be presented to the navy department.

Applications to be allowed to share in this prize have been presented in behalf of the following vessels: New Ironsides, Stettin,

---

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

Wamsutta, Flag, Paul Jones, Lodona, Marblehead, Huron, Powhatan, and Housatonic. Some of these applications are quite informal. But I shall treat them all as petitions duly presented. Since the decree of condemnation, the depositions of one or more of the officers of each of the above-mentioned ships have been taken. These have been examined with the other evidence in the case. It appears that the Canandaigua and the petitioning ships composed the blockading squadron off Charleston. All, excepting the Lodona, were stationed at different places immediately off the city, so as to guard the more direct approaches. The Lodona was stationed at Bull's bay, to guard that channel of communication to Charleston, and was about sixteen miles from the rest of the squadron.

On the evening of the 5th of May last, the Cherokee ran out of the port of Charleston. She was first discovered by the steamer Flag, who fired one or more guns at her, as she was passing by, and also threw up a rocket. She was then discovered by the Canandaigua, a steamer lying outside of the Flag, which immediately got under way in pursuit. This was about eleven o'clock at night. The pursuit was continued about three and a half hours, when the Canandaigua, having come within cannon range, fired a gun, and the Cherokee hove to and surrendered. The commencement of the chase was seen by several of the blockading vessels, but no one of them started in pursuit. All remained at their anchorage. Both pursuer and pursued were entirely lost sight of about one hour after the chase began; and the place where the capture was actually made was thirty-five miles from the blockading squadron. No vessel of the squadron was within signal distance of either the Canandaigua or Cherokee at the time of the capture.

All prizes made by our ships-of-war belong primarily to the United States, and any person who claims to participate therein must show a grant from the government. There have been three acts of congress making such grants: that of 1799, c. 24 (1 Stat. 715); that of 1800, c. 33 (2 Stat. 52); and that of 1862, c. 204 (12 Stat. 606). The first of these three acts remained in force about a year. Its provisions are so similar to those of subsequent acts that they need not be here recited. The fifth section of the act of 1800 says "that the proceeds of all ships and vessels, and the goods taken on board of them, which shall be adjudged good prize * * * when of inferior force, shall be divided equally between the United States and the officers and men making the capture." The sixth section provides that "whenever one or more public ships or vessels are in sight at the time any one or more ships are taking a prize or prizes, they shall all share equally in the prize or prizes." The statute of 1862 (section 2) copies the first of the foregoing provisions verbatim. But it does not preserve the phraseology of the second. In section 3 it says, "When one or more vessels of the navy shall be within signal distance of another making a prize, all shall share in the prize."

This appears to be a substitute for the corresponding provision in the act of 1800. But it is unnecessary to consider whether it be so or not, it being immaterial in the present case whether the former is superseded by the latter, or whether both may stand and be enforced together. These petitioning vessels do not come within either clause. No one of them was within sight or signal distance of the Canandaigua when she was taking or making this prize. This is not contended for. They rest their claim wholly upon the fact that they, together with the Canandaigua, composed the blockading squadron. Does that fact bring them within the first provision of the statutes of 1800 and of 1862; which has already been quoted? The question, then, is reduced to this: Are the officers and men who were on board these vessels to be deemed "officers and men making the capture," within the meaning of the statute? That the capture was actually made by the Canandaigua when and where no other vessel was in sight or in a condition then to render any aid whatever, is certain.

Those on board the other vessels, therefore, were not actual captors. The question is, are they to be deemed captors by construction of law, by reason of their being a part of the blockading squadron? If we look only at our own statutes, the present question might be solved without much difficulty. They manifestly provide for two classes of ships:—First. Those making the capture. Second. Those within signal distance of a vessel making a capture. The second section of the act of 1862 gives one-half to the "officers and men making the capture." The third section gives a share to any vessel of the navy which "is within signal distance of another making a prize."

Thus the statute, in the first place, gives half of the prize to those making the capture, and then provides that another class shall share with them; viz., vessels not themselves making the prize, but within signal distance of those that do make it. From this it seems clear that the first class are those who actually make the capture, and that none others can participate except those provided for in the second class. This construction would be adopted without hesitation, were it not for certain English doctrines, which have been supposed by some to have a direct and even controlling application to our law. It becomes necessary to bestow some attention upon the decisions in which those doctrines are to be found.

It must be borne in mind that we are not discussing a question of general jurisprudence, or endeavoring to ascertain a rule of the unwritten law to be determined by judicial precedents or considerations of justice and policy. But we are endeavoring to as-

certain the true meaning and intent of a positive legislative enactment. Of course we do not look to British decisions for any direct exposition of our own statutes, to which they can, at most, have but an indirect application. Those decisions are under the English prize acts; that is, they give construction to their own positive enactments. Now, if the language which describes those who are to share in the prize be the same in our statutes as in the British, then English decisions may have some application.

If such language of the British statutes had received a judicial interpretation, and had thus acquired a settled and well-known meaning, and our legislature had then adopted the same language, it might well be supposed that they intended it should bear the same interpretation. We must, therefore, endeavor to ascertain what was the provision of the British statutes, and how far there had been any settled and well-known construction thereof at the times when our statutes were passed.

The prize acts of 6 Anne, c. 16, 43 Geo. III. c. 160, 45 Geo. III. c. 72, and of 55 Geo. III. c. 160, give the prize to the officers and crew by whom it "shall be taken." There was a prize act in 33 Geo. III., which is noticed as expired, but not printed in the British statutes at large. There can be no doubt, however, that it gave the prize to those who should take it; for, in the year 1799, Sir William Scott, in the case of The Vryheid, 2 C. Rob. Adm. 21, says, "The act of parliament and the proclamation give the benefit of prize to the takers." In the corresponding provision in our prize acts, instead of the word "take," the word "capture" is used. I do not think that there is any difference in the import of these two words, in the connection in which they are used; and I proceed to consider the effect of the British interpretation of their statutes in the same manner as if our own had, in this first provision, adopted their language without the change of a word.

In construing their prize acts, the English courts have divided the takers or captors into two classes,—the actual captors, and the constructive captors. As to who should be deemed actual captors, there seems to have been little question. But there has been much doubt and difficulty in determining who should be permitted to share as constructive captors. Judicial decisions have admitted two classes of king's ships. The first is those in sight at the time of the capture. This rule of construction, doubtless, grew out of the difficulty of defining the limits of actual assistance by joint action or cooperation. If two ships were engaged in the combat with the enemy, it is manifest that both actually contributed to the result. So where several vessels placed themselves in such positions and proximity to an enemy's ship that she could not escape, and she struck without resistance, because resistance to

such numbers would be useless, it is manifest that all were at the time directly instrumental in effecting the result. Then come cases of ships being present, or within sight, at a greater or less distance from the actual captor, creating doubts whether they gave efficient aid, or contributed in any and what degree to the capture, which doubts it would be impossible satisfactorily to solve; and to avoid them, and the litigation and uncertainty which would attend each of the numerous cases that might arise, the courts adopted a general rule that a king's ship being in sight should constitute her a joint captor by construction of law, upon the ground, that it must be presumed that the actual captor was thereby encouraged, and that the enemy was intimidated. The rule required that she should be in sight not only of the capturing ship, but also of the enemy. There were some exceptions. The Robert, 3 C. Rob. Adm. 195.

The doctrine, that a king's ship being in sight entitled her to share in the prize, was firmly established. This rule had the advantage of being well defined, and of resting on an intelligible reason. A second class of constructive captors has been introduced by judicial decisions. They are those who, not being in sight at the time of the capture, are nevertheless permitted to share in the prize by reason of some association with the actual captor.

These petitioners claim to come within this class, by reason of their being associated with the Canandaigua in the same blockading squadron. It becomes necessary, therefore, to inquire how far, at the several times when our respective prize acts were passed, there was any settled and well-known construction by which such association conferred the rights of constructive joint captors. Our earliest prize act was in 1799. That, as already stated, has been repealed. The next was in 1800. What was the state of the British adjudications at that time? There is no doubt that they recognized two classes of captors, one the actual, and the other the constructive; and that they had determined, that a vessel in sight at the time of the capture should share in the prize as constructive captor. But the question is, how far had the doctrine of association been then established? There were doubtless many decisions before that time; but, for the want of trustworthy reports, our means of ascertaining what they were are very imperfect. We have to rely mainly upon such glimpses as we obtain from fragmentary statements made by the court or counsel in the trial of subsequent cases. Of the earlier cases thus referred to, the one most in point is The Mars, decided by the lords 1760, and cited in The Vryheid, 2 C. Rob. Adm. 22. It is thus stated in a note: "This was a case of a French ship taken by one of three king's ships, which, being apprised of the design of the enemy to escape from Port au Prince,

had taken their station àt different outlets to intercept them. The capture was made by one ship. A claim was given on behalf of the other two, to share as joint captors, though not present at the capture; but it was rejected."

In 1800, the knowledge of previous decisions seems to have rested in a great degree, upon tradition, or upon the recollection of the judges and counsel who had been engaged in the trials. We learn something of the state of the law in 1799, by what is said by Sir William Scott in The Vryheid. After remarking that that was a case of joint capture, that is, a claim to participate as constructive captors, he says: "The court has to lament that cases of this nature are, in general, attended with much difficulty, as they depend frequently on very minute facts, on which the court has to decide between contradictory representations; and it is to be regretted that the decisions of the courts on this subject have not always been so uniform as it is highly desirable they should be." Again, on page 23, he says: "The being in sight, generally, and with some few exceptions, has been so often held to be sufficient to entitle parties to be admitted joint captors, that, where that fact is alleged, we do not call for particular cases to authorize the claim; but, where that circumstance is wanting, it is incumbent on the party to make out his claim by an appeal to decided cases, or at least to principles which are fairly to be extracted from those cases."

There does not appear to have been any decision inconsistent with that in The Mars, much less any one that could control it; and it cannot be said, that, in the year 1800, the English courts extended the doctrine of constructive capture by association to cases of blockade, much less that there was any such settled and well-known rule in that respect as to create a presumption that congress intended to adopt it, even if it had copied the provisions of the British statute. In such case, it might have been inferred that it was satisfied with the decisions that had been made in regard to ships in sight, and approved of the rule thus adopted. But its intention in this respect was not left to inference. It introduced a new provision, giving to ships in sight the rights of joint captors, thus expressly declaring how far it intended to adopt the doctrine of constructive capture, and repelling the presumption that it intended to sanction it in other cases.

But it has been said, that, previous to the passing of our prize act in 1862, the doctrine of constructive capture by association had been fully established by judicial decisions, and especially in case of blockade. There have been no such decisions in this country. No such construction, therefore, had been given to our own statutes. All the adjudications relied upon were made in England in giving a construction to their own prize acts. Those decisions require some attention.

The case of The Vryheid, which was decided in 1799, has already been referred to. The claim of a ship to share in a prize made by a fleet of which she had been a part was rejected, upon the ground that she had been temporarily detached upon a separate service before the chase began. There are subsequent decisions to the same effect. See The Island of Trinidad, 5 C. Rob. Adm. 92.

In The Forsigheid, 3 C. Rob. Adm. 315, 316, the ship-of-war Director being one of a fleet which was blockading the Texel, was sent to look out, and, while out of sight of the rest of the fleet, made the capture. "The captured ships were not seen by the fleet till they were in the possession of the actual captor." Sir William Scott decided that the whole fleet was entitled to share in the prize. This decision was on the 17th of June, 1801.

On the same day, in another case, The Harmonie, 3 C. Rob. Adm. 318, it appeared "that the Scorpion and the Fox were sent by Captain M'Doual, commander of a squadron employed in the blockade of the Texel, as small vessels that drew less water, to cruise for the purpose of keeping up the blockade nearer in upon the coast, where large ships could not safely venture on account of the shoals. It was admitted that the capture was made ten leagues from the fleet, after a chase of three or four hours, and completely out of sight." Sir William Scott held that the fleet were constructive joint captors.

In the Genereux, decided by the lords in 1803, referred to by the court and counsel in The Guilliaume Tell, Edw. Adm. 9, 16, the capture was made by the Foudroyant and two other ships. The Lion claimed to be admitted as joint captor. It appears that they all belonged to a squadron under command of Lord Keith, who, having received information that a French squadron consisting of four ships was on the way for the relief of the French garrison at La Valette, immediately made such disposition of his ships as would be most likely to intercept them. "The Foudroyant and two other ships-of-the-line were ordered to look out for the enemy in the south-south-east, and the Lion was ordered to take a station off the passage between Gaza and Malta," and the rest of the vessels were stationed in another place or places to prevent the enemy from entering La Valette. The Foudroyant, and the two vessels with her, fell in with the enemy and captured the Genereux on that side of the island which is opposite to La Valette. At the time of the capture, the Lion was sufficiently near to hear the report of the guns during the engagement. The Lion and the other stationed ships formed a part of the same squadron with the Foudroyant and her two associates. All were under the same commander, and took their respective stations, by his order, to intercept the enemy. Such were the allegations in behalf of the Lion. The court held that the allegations were insufficient; that is, that, if all the facts thus alleged were true,

still the Lion was not entitled to share, because she was not in sight at the time of the capture.

In The Guilliaume Tell (decided in 1808) Edw. Adm. 6, the Northumberland and Culloden were part of a squadron blockading the port of La Valette, in which were known to be two French ships-of-war. The capture of these ships was a special object of the squadron, they having also the general purpose of preventing the escape of other vessels and of taking the place. One of them, which attempted to escape in the night, was pursued and captured by some of the fleet. The petitioning vessels had taken an active part in the preconcerted measures to prevent the escape, but did not join in the pursuit nor leave their anchorage. It does not clearly appear, from the statement of facts by the reporter, whether the capture was made within sight of the petitioning vessels or not.

Sir William Scott, at the close of his judgment, states the grounds upon which it rested, as follows: "Now, in this case, there was not only an actual sight, not only a perfect connusance of what was going forward, but as complete and uniform and persevering an association in this particular object, as well as in the general objects of the blockade, as can be imagined. I am therefore of opinion, that the Culloden and Northumberland are entitled to share." It is to be observed that the judge states, as a material circumstance, that these vessels were in sight. I do not think that it is to be inferred that they were in sight at the time of capture, but only at the beginning of the chase; and this, I suppose, was relied upon to distinguish it from The Genereux. There is another circumstance which is emphatically dwelt upon by the judge. It is that the vessels of the squadron were associated not only in the general object of a blockade, that is, to prevent the ingress or egress of any vessels, but in the special purpose of preventing this French ship-of-war from escaping. After having spoken of these ships as being part of a squadron associated for the express purpose of making the capture, he says: "The whole fleet were acting with one common consent, upon a preconcerted plan, for the capture of this prize;" and again, in the quotation before made from the concluding part of his opinion, we notice this explicit language: "There was * * * as complete and uniform and persevering an association in this particular object, as well as in the general objects of the blockade, as can be imagined."

From this judgment it would be inferred that merely being part of blockading squadron to prevent the egress of all vessels, without the special object of capturing that ship, or preconcerted measures for that particular purpose, would not have entitled the ships which remained at anchor to participate with those who pursued and captured, and that being associated both for that special purpose and the general object of the block-

ade would not have been sufficient without at some time being in sight. From this it would seem that, under the pressure of the authority of The Genereux, the learned judge no longer insisted upon the doctrine which he had laid down in The Forsigheid, in the year 1801. But in 1809, that case came again before him, after proof had been taken to support the allegations which he had admitted, and he then re-affirmed his former decision, using the following language: "Upon the principle which I laid down upon the admission of the allegation, I am bound to pronounce that the whole fleet must be entitled as joint captors." Edw. Adm. 127.

In Le Bon Aventure (decided in 1810 by the lords) 1 Act. 239, Sir William Grant, in delivering the opinion of the court, states the question to be "whether a vessel commencing a second chase, in sight of a fleet of which she had constituted a part before she had been detached, by signal, upon a former chase, and capturing the second chase at any distance from such a fleet, would necessarily, upon this principle, be compelled to let in the claim of the whole fleet to share in a prize so made, notwithstanding such fleet afforded no assistance or co-operation in the capture, but actually bore away from the captor on another tack." He declared that no such principle had ever been recognized, and the claim of the fleet was rejected. But in The Empress (decided by Sir William Scott in 1814) 1 Dods. 368, the ship-of-war Beagle, while pursuing an enemy's vessel, discovered another ship-of-war, the Rover, also in chase of her. Both continued the pursuit for some time, when a second enemy's vessel hove in sight. Thereupon the captain of the Beagle, being the superior officer, ordered the Rover to discontinue the pursuit of the first, and pursue the second enemy. She did so, and after continuing the chase for ten hours, and until out of sight of the Beagle, made the capture. The Beagle was admitted to share in the prize by reason of the alleged association, although her meeting the Rover on the ocean was accidental, and she had continued her course without pause or deviation in pursuit of the first enemy's ship, and had afforded no assistance or co-operation in the capture, but actually bore away from the captor. It is not easy to see how the officers and crew of the Beagle could be deemed to have taken the second enemy's ship, when they were, all the time, sailing for another object, in a different direction until out of sight, and did not even know of the capture until some time afterwards.

The L'Etoile, 2 Dods. 107, does not go so far as The Empress. In The Naples Grant, 2 Dods. 277, it is held as a general rule, that in order to confer a right to share in a prize upon a vessel which is engaged in the common service in a blockade, or in naval or military operations of that kind, it must be shown that such vessel was present at some period of the operation, either at the commencement, the

intermediate stage, or at the time of the surrender. It is added that this rule may not be without exceptions.

In The Nordstern (decided in 1809, by the lords) 1 Act. 140, the court say, "Upon this we are decidedly of opinion, that it is not sufficient a joint enterprise shall exist at the time, except it expressly refer to the capture in question; or, in other words, that the capture grew out of the purpose and object for which the parties have been united, and be the joint produce of an actual co-operation and the object of union." This language, especially the concluding sentence, and the decisions in The Mars and The Genereux indicate a disposition in the appellate tribunal not to go beyond the line of actual joint capture. The courts have undoubtedly in many cases gone beyond this line; but their decisions have not been uniform, and to what extent they mean to carry the doctrine of constructive capture by association is left in doubt.

Looking at the adjudications of both the superior and subordinate courts, it cannot be said that they present any settled and well-defined rule. Indeed, the whole course of the decisions in favor of constructive joint capture is most remarkable. Their only foundation is the express language of the statute. And their only legitimate authority is to give a just construction to that language. Yet, except in the case of The Vryheid (decided in 1799) we find no reference whatever to any statute. We look in vain, not only for the terms of any act of parliament, but for any remark which indicates that any such act existed. The claims of captors are discussed, not as resting upon express grant, but as if they were questions of common law, depending merely upon previous decisions and general considerations of justice and policy.

In The Vryheid, 2 C. Rob. Adm. 21, Sir William Scott says that by the word "takers," in the act of parliament, are naturally to be understood those who actually take possession, or those affording an actual contribution of endeavor to that event. Either of these persons are naturally included under the denomination of takers; but the courts have gone further, and have extended the term "taker" to another description of persons,—to those who, not having contributed actual service, are still supposed to have rendered a constructive assistance; thus distinctly admitting that the courts had gone beyond the natural import of the statute. In a subsequent case, The Financier, 1 Dods. 67, the same learned judge says, "The admission of a constructive captor to share with an actual captor is, in itself, an indulgent construction of the law, which must not be further extended." Thus it appears that the constructive captor comes in by the in indulgence of the court, and not by the natural construction of the statute grant. In reading many of the decisions, it is evident that the courts, following their own views

of policy or expediency, have indulged in a latitude of construction which has carried them out of sight of the test which they were supposed to be expounding. That the decisions had gone beyond the just interpretation of the terms of the grant is not unfrequently admitted by the courts themselves.

Besides the remarks already quoted, Sir William Scott, in The Vryheid, page 22, after having stated that the act of parliament gave the prize "to the takers," says, "For, as the word has already travelled a considerable way beyond the meaning of the act of parliament, the disposition of the court will lean, not to extend it still farther, but to narrow it, and bring it nearer to the terms of the act than has been done in some former cases." In The Odin, 4 C. Rob. Adm. 325, the court says, "The principle of constructive assistance has been altogether thought to have been carried somewhat far."

In La Furieuse, Stew. Vice Adm. 179, the court says "that, as a general principle, it has been the object and intention of the courts of vice admiralty, to narrow rather than to extend the interest of joint captures, and to confine as much as possible the benefit of prize to such vessels as are the real and actual captors."

In Le Niemen, 1 Dods. 16, it is said by the court, "It certainly is not, at this time of day, the disposition of the court to extend the limits of joint capture." In The Arthur, Id. 426, it is said, "The principle of association has not been of late favored either here or in the court of appeal." This was in the year 1814. In L'Etoile, 2 Dods. 107, the court says, "There was an actual engagement between the Sparrow and the enemy; and this circumstance does, I think, discharge the legal prejudice which prevails against a constructive joint captor." This was in the year 1816, after the termination of the wars which grew out of the French revolution and the reign of Napoleon the First. Thus it appears that a "legal prejudice," that is, a prejudice by the legal profession, then prevailed against constructive joint captors. Since that time there have been no decisions upon that subject, which have come to my knowledge.

At the commencement of the Russian war, in March, 1854, the queen, by proclamation, granted the proceeds of prizes to the takers, and prescribed the manner in which they should be divided. That proclamation contained the following clause: "Ships or vessels, being in sight of the prize, as also of the captor, under circumstances to cause intimidation to the enemy and encouragement to the captor, shall be alone entitled to share as joint captors."

In June following, a prize act was passed by parliament, as usual, in confirmation of the royal grant made by proclamation. It did not contain this clause respecting vessels being in sight, and it has been suggest-

-ed that such omission is to be regarded as a disapproval of it. But it is to be observed that the preamble refers to the proclamation as a grant made by royal munificence to the captors, and the act repeats the grant, but makes no distribution of the proceeds of prizes, but expressly confirms the division which had been made by the proclamation. From this the fair inference is that parliament deemed the clause giving vessels in sight a right to share, and none others, to be a part of the rules of division, and that it was not the intention of the legislature in any degree to change what they have recognized as a rightful grant by royal munificence. If this be so, then the doctrine of constructive capture by association has been discarded both by the advisers of the crown and by the parliament.

If it should be thought by any one that the omission of that clause in the act of parliament is to be regarded as a disapproval of it, then it would exhibit the same want of accord between the executive and legislative departments, and the same unsettled and unsatisfied state of mind as previously existed in the courts and the legal profession. But the act of parliament is passed chiefly for the purpose of confirming the royal grant of the prizes which belong to the monarch, but are held jure coronae, and grants of which, the commons contend, require the sanction of parliament.

From the foregoing review, it appears that the judicial doctrine of constructive capture by association has not been uniform, and is not well defined and well settled. It has encountered the decided disapprobation of the profession; and the courts have not unfrequently indicated that it was not satisfactory even to themselves, and seems finally to have been discarded by royal proclamation. It is by no means commended to our understanding, as founded on sound principles of interpretation.

I do not think that it could be rationally presumed that congress intended to adopt it by their act of 1862 [supra], even if the provisions of that act were the same throughout as those of the British acts. But they are not the same. Our statute contains a new and highly important provision. The third section says, that "when one or more vessels of the navy shall be within signal distance of another making a prize, all shall share in the prize." It is contended, on the side of these petitioners, that congress did not intend merely to follow our prize act of 1800 [supra], but that they must have known and had in view the British doctrine and decisions. Assuming that to be so, then they knew that one part of the doctrine of constructive capture was well defined and well settled upon rational ground, while another part was not well defined, and was not sustained by uniformity of decision or just principles of construction, and had been discountenanced by the profession. Thereupon

they expressly adopt the first part, but do not so adopt the second.

Does not this clearly show, that they did not intend to leave it to the courts to determine how far the doctrine of constructive capture should be deemed or made a part of our law, but chose to determine it themselves, and fix the limits by express enactment? And having so introduced the first part of such doctrine, and not the second, must we not infer that they did not intend to adopt both?

It is not a case for the application of the maxim "expressio unius est exclusio alterius," especially as we see good reason both for the adoption of the one and the exclusion of the other. There is another view. By our statutes, there are two classes of ships, and two classes only, which are to participate in the prize. The first are those who make the capture, or, in other words, those making the prize. The second class are those within signal distance of one of the first class. The language is, any ship within signal distance of another making a prize. If, then, each one of a blockading squadron comes within the first class, and is a vessel making a prize within the meaning of the statute, then any vessel that is within signal distance of her is one of the second class, and entitled to share by the express words of the statute; and the result would be, that a ship of a blockading squadron lying at anchor, and not herself being within signal distance of another making a prize, and having no knowledge of the capture until some time after it was effected, will not only share herself, but bring in another vessel not associated in the blockade, which merely happened to be within signal distance of her at the time when a capture was made, of which both were wholly ignorant. This is an absurdity which no one can believe the legislature intended. It may be asked, why did not the same result follow from the English decisions? The answer is, that the whole doctrine of constructive capture was the creature of the courts, and in their hands all its parts were flexible. They moulded it at pleasure by limitations or alterations according to their views of expediency. They did not build construction upon construction. Thus, where a ship became a constructive captor by being in sight, they did not permit one associated with her, but not in sight, to be a captor by construction, although it was by obeying an order to pick up the boats of the first that she was prevented from being also in sight. The Financier, 1 Dods. 67.

But our legislature having provided that one class of those who had been decreed constructive captors shall be entitled to share, and thus given them an express statute right, if the court shall introduce another class of constructive captors, and hold that they are "ships making the prize" within the meaning of the statute, then the result which has already been stated will follow. This,

as we have seen, congress could not have intended. The first class of grantees, therefore, can embrace only actual captors; and this conclusion is in accordance with the fair and natural import of the language of the statute.

The result is that no vessel is entitled to share with the Canandaigua.

See the Aries [Case No. 529]; The St. John [Id. 12,225]; The Ella & Anna [Id. 4,368].

NOTE [from original report]. We are indebted to the courtesy of the district attorney of the United States for the district of Massachusetts, the Hon. Richard H. Dana, Jr., for the foregoing opinion of the experienced and learned judge of that district, Mr. Justice Sprague; and we are assured by Mr. Dana, and fully concur in the assurance, "that this opinion of Judge Sprague is of the utmost interest to the navy; that it is the leading case, and is most thoroughly considered." Nothing which we could add would be esteemed of much value beyond such an indorsement, from such a source, Mr. Dana being not only a good lawyer, everywhere, but especially devoted to admiralty and prize law. But we desire to commend, in a special manner, this opinion of Judge Sprague to the bench and the bar throughout the land, as drawn up with that patient labor and research, which makes it a mine of wealth to all who may possess it. Such a thorough revision and careful analysis of the cases, presenting them in detail, and sufficiently at length to make them intelligible, even to unprofessional readers, renders the opinion, and any opinion drawn up in that authentic and reliable manner, almost invaluable as a matter of convenient reference ever after. There is no one thing wherein the public poorer proves economy, than in requiring so much labor of their judges, in courts of final adjudication, as to render it absolutely impracticable for them to wait long enough, to obtain a full survey of the field lying behind them, before they are compelled to take a leap into the future, which too often proves in the sequel, but a leap in the dark.—I. F. R.