## Case No. 4,368.

### The ELLA & ANNA.

[2 Spr. 267;[1] 26 Law Rep. 669.]

District Court, D. Massachusetts. April, 1864.

R. H. Dana, Jr., U. S. Atty., for the Niphon.

W. A. Field, for the Shenandoah.

C. C. Dame, for the Tuscarora.

SPRAGUE, District Judge. This vessel and cargo have been condemned as lawful prize, and I am now called upon to determine to what vessels of the navy the proceeds shall be decreed.

The capture was made by the steamer Niphon, commanded by Lieutenant Breck. Four other vessels, the Shenandoah, Houqua, Daylight, and Tuscarora, have severally presented applications to be admitted to share in the proceeds. The petitioners rest their claims solely on the allegation that they were respectively "within signal distance of the vessel making the prize."

Prizes belong primarily to the government. The policy and propriety of giving the proceeds wholly or in part to the captor are manifest; but why should others, who did not even aid in making the capture, share equally with those who actually made it? A glance at the history of the law on this subject may be of use in discovering the reason. In England, from an early period, prizes have been granted by statute to "the takers." This language, in its natural import, embraces only those who actually make the capture. But

---

[1] [Reported by John Lathrop, Esq., and here reprinted by permission.]

the judicial tribunals introduced what they denominated constructive captors, and of these there were two classes. One of these was admitted to share by reason of being in sight at the time of the capture, and the other because of being intimately associated in a common enterprise. The doctrine that vessels in sight should be admitted as constructive joint captors was established prior to the year 1799. At that time this doctrine was adopted by an act of congress, which remained in force one year. Act 1799, c. 24, § 6 (1 Stat. 715). But this provision was reenacted by St. 1800, c. 33, by which one-half of the proceeds of prizes, when of inferior force, were, in the first place, by section 5, given to the captors, and then, by section 6, vessels of the navy in sight at the time were entitled to share equally with the captors. Act 1800, c. 33 (2 Stat. 52, 53). This continued to be the law of the United States until the year 1862, when, by Act 1862, c. 204, § 3 (12 Stat. 606), "signal distance" was substituted for the being in sight. Thus our enactments respecting being in sight and within signal distance seem to have had their origin in the doctrine of the English courts. Upon what reason was that doctrine founded? The statute, as we have seen, gave the prize to "the takers." But who were to be deemed the takers? If there was a battle, all those who took part in the conflict were clearly actual captors. But then there was another class of vessels, perhaps of superior force, who were in such immediate proximity, and took such positions to prevent the escape of the enemy, as actually and materially to contribute to the result. Then came another class, whose mere presence constituted such an overwhelming force at hand, that it might be presumed to have contributed to the capture, by intimidating the enemy and encouraging the friend; but what should be deemed such presence, and under what circumstances would such a presumption arise? The line must be drawn somewhere, and the courts prescribed the rule as follows: In the first place, that none but king's ships could share by reason of being in sight. Privateers were excluded, because, not being bound to render assistance, there was no sufficient presumption that they would do so. And, in the next place, to entitle king's ships to share, it was necessary that they should be actually in sight both of the capturing and captured vessels, under such circumstances as would give encouragement to the captors, and cause intimidation to the enemy. If the king's ship was utterly disabled, or prevented by other duties from rendering aid, as, for example, if she was engaged as convoy, or if she continued on a course which was carrying her away from the scene of the capture, making it manifest that she did not intend to co-operate, she was not admitted as a constructive joint captor. Thus the doctrine of the courts, by which vessels in sight were permitted to share, was founded on the presumption that their presence contributed to the result, at least by encouragement to the one party and intimidation to the other. This doctrine was modified or guarded by stringent rules respecting the kind and degree of evidence that should be required. In the first place, as already stated, direct evidence of being in sight was indispensable. In the second place, testimony coming only from the asserted joint captors, however strong, was not sufficient; and Sir William Scott, in The Robert, 3 C. Rob. Adm. 201, speaking of the asserted joint captors, says: "On this proof it is impossible to say that they have performed the task which the law imposes on them of bringing unequivocal, direct, and unsuspicious evidence of their claim." Again, in the same case, (page 195), he says, "Where no actual assistance is alleged, the presumption of law leans in favor of the actual captor."

The doctrine of constructive capture, limited and guarded as it was by these rules, still appears not to have found favor with the legal profession; and the courts themselves sometimes admit that it had not been sufficiently restricted and guarded. The Vryheid, 2 C. Rob. Adm. 16; The Financier, 1 Dods. 67; The Odin, 4 C. Rob. Adm. 325; La Furieuse, Stewart, Vice Adm. 179; Le Niemen, 1 Dods. 16; The Arthur, Id. 425; L'Etoile, 2 Dods. 107.

The change made by substituting signal distance for being in sight, by our statute of 1862, is far from being immaterial; and English decisions are not authorities to be implicitly followed. But when the reasons upon which they are founded are applicable, and commend themselves to our understanding, they are entitled to consideration, not only for their intrinsic force, but as having been adopted and acted upon by judicial tribunals of very great experience and intelligence.

Without going as far as the English courts, we may at least say that those who claim to share equally with the actual captors should be required to produce evidence of such character and weight as to satisfy the mind of the court, and render it reasonably certain that they were within signal distance. Reason and policy dictate that no part of the prize should be taken from those whose vigilance, energy, skill, or courage achieved the capture, to be given to others who contributed no assistance, and were so remote as to render it very doubtful whether a request for aid could have reached them, if aid had been desired.

Questions have heretofore arisen in this court upon the provisions of the statute respecting signal distance, but none in which the evidence was so multifarious and conflicting, or which required so close a scrutiny into the principles by which the court should be guided in analyzing, weighing and applying the evidence, and giving

a true construction and proper effect to this new provision of the law.

The first question that presents itself is, *what signals are sufficient?* It has been contended in this case, and in prior cases, that signals by guns or rockets answer the requirement of the statute. Without undertaking to decide that a code or system of such signals may not be invented and adopted, so as to answer the purposes of the law, it is sufficient to say that the evidence does not show that any such system has been established. This capture was made by one of the blockading squadron off Wilmington, N. C. It appears that the commanding officer on that station had given instruction to the vessels of the squadron, that, upon discovering a blockade-runner, a rocket should be thrown up in the direction in which she was going, and a gun fired to attract attention. This is the extent to which any particular meaning was attached to those acts. The direction of a rocket indicated the course of a blockade-runner. A gun was to be fired, but without any special significance, and having only its natural effect of arresting attention. The most that can be said is, that by these means notice was given that there was a blockade-runner going in a certain direction, but they were not signals by which there could be any intercommunication. There was no recognized mode by which a vessel, seeing a rocket and hearing a gun, could return any answer, even to the extent of making known the fact that they were observed. If a vessel should throw up a rocket or fire a gun under these instructions, it could not be construed into an acknowledgment of the notice; but the meaning would be that such vessel had discovered a blockade-runner taking a certain course, and wished to attract attention.

In the case of The Aries [Case No. 529], it appeared that the commander of the blockading squadron off Charleston, S. C., had given orders that a rocket should be thrown to indicate the direction in which a blockade-runner was going, and that, if two guns were heard in quick succession, it was the duty of the vessel hearing them to go immediately and ascertain the cause of the firing. This went somewhat farther than the instructions to the squadron off Wilmington. Yet, in that case, I held that no such system of signals by guns or rockets had been established as would meet the requirements of the statute.

Lanterns have been spoken of by several of the witnesses as being frequently used. But it is admitted that they cannot be seen as far as the Coston lights. It is unnecessary, therefore, to make any remarks respecting them. This capture was made at night, and the result is that the only signals which can be regarded in the present case are those denominated "Naval Night Signals," that is, the Coston lights.

The next inquiry is, from what part of the vessel must the signals be visible? Is it sufficient if they might be seen from the mast-head, and not from the deck? It is a great privilege to any vessel to be allowed to share in a prize which she has not actually aided in capturing. Such indulgence is not to be granted without good reason. It ought not to be enjoyed by any vessel, unless she is within such distance as gives assurance that she would render actual assistance if called upon, and could afford encouragement to the captors, by their knowing that such assistance was at hand.

On board of a vessel at sea, there is at all times kept a watch on deck, composed of some of the officers and a considerable part of the crew, some of whom are specially designated as the look-out, and all are required to be vigilant. In a well-ordered ship, a light exhibited in any part of the horizon would be immediately discovered and attended to. A man may indeed be sent aloft, and stationed there as a look-out, but this at night is exceptional; and if by such means a signal should be discovered, which could not be seen from the deck, still it would not avail unless there should also happen to be a man at the mast-head of the capturing vessel, who should see the signals made in response. The possibility that signals might be interchanged in such manner does not answer the purpose of the statute. It does not give adequate assurance that, if the capturing vessel had shown the usual Coston lights, they would have been seen and read, or, if seen, that the answering signals, made in the usual manner, would have been discovered and understood by the capturing vessel so as to give her that encouragement and confidence which the knowledge that assistance was at hand might inspire.

I am not speaking of a case in which signals are actually interchanged, and seen and understood by means of persons at the mast-head of both vessels. I have no occasion to consider and express an opinion upon such a state of facts. In the present case, no signals were made. In England, a vessel being visible from the mast-head only, although actually seen from that position, is not deemed to be in sight so as to be entitled to share in the prize.

Another question has been presented. Some of the witnesses from the petitioning ships say that, under the most favorable circumstances, the Coston lights may be seen nine miles, and thence infer that signal distance always means that number of miles.

This is founded on the assumption that signal distance is a certain number of miles, and is applicable to all cases, without regard to the state of the atmosphere or other obstructions in the particular instance. This is an error. The statute confers the right of sharing in the proceeds upon any vessel of the navy which "shall be within signal

distance of another making a prize;" that is, if she be within signal distance of that vessel at that time. If the state of the atmosphere, from fog or haze, for example, is such as to prevent signals being seen, neither the language nor the reason of the statute is satisfied. Of what benefit would it be to a capturing vessel that another should, without her knowledge, be within a certain number of miles, but to which she could make no communication, and from which she could receive no encouragement, by promise of assistance or otherwise?

The question, then, is reduced to this: If, at the time of making this capture, the Niphon had made signals by the Coston lights in the usual manner, were these petitioning vessels, or was either of them, within such distance that such signals could then have been seen and read from her deck or top-gallant-forecastle?

The Niphon was one of the blockading squadron off Wilmington. The line of the coast there lies nearly north and south, the sea being to the eastward.

On the morning of the 9th of November last, the Niphon was a short distance from the shore; and at about twenty-five minutes past five o'clock, when it was so dark that a ship could be seen but a short distance, she discovered a vessel running down the coast, that is, from north to south, very near to the beach. The Niphon immediately steered toward the shore, in a direction that would cut her off, and fired at her from the bow, and, when quite near, from the broadside also. Very soon after the Niphon had taken a direction to cut off the strange vessel, it was discovered that the latter had altered her course to the eastward, and was aiming to run the Niphon down, by striking her amidships. Both vessels were at full speed. The commander of the Niphon immediately ordered her helm hard to starboard, by which her course was changed so as to be nearly in the same direction as that of the other vessel. They struck each other at the bows. A portion of the Niphon's crew immediately jumped on board the other vessel, and carried her by boarding. This was from ten to fifteen minutes only from the time she had been first discovered. She proved to be the Ella & Anna, an iron steamer of about a thousand tons burden, with a full cargo. She had forty pounds of steam on, and several hundred pounds weight on her safety valve, and must have been going at her utmost speed. The Niphon was a steamer of five hundred tons burden, with an iron frame and wood planking. If she had been struck on her side, nearly at right angles, as the enemy had intended, she must have been so seriously injured that she would probably have gone down in a few minutes, and there was but little chance for any of her crew to have survived.

As before stated, this capture was made at night. No signals were made; and it is not contended that either of the petitioning ships was in sight, or that there is any direct evidence in support of their claims. They rely wholly upon circumstantial evidence. They undertake to establish certain facts, and from them to deduce the conclusion that their vessel was in the requisite proximity.

They have attempted to do this in two modes: First, by ascertaining the position of each vessel at the time of the capture in relation to certain monuments or landmarks on the coast, and then the distance between such monuments, and thence to infer the distance of the vessels from each other. The other mode is by first ascertaining the time of the capture, and then the time when the capturing vessel was afterwards first seen, and at what distance, and how far and in what direction each vessel had moved in the interval between the capture and their first coming in sight, and, from these premises, to infer the distance between the vessels at the time of the capture.

The learned judge then proceeded to a minute and careful analysis of the evidence of forty witnesses and of the charts. He pronounced the testimony very conflicting in many respects, especially in respect to the exact time when the chief events occurred, and the estimated distances at which objects were seen. The result to which he arrived on the chief points of fact may be stated thus: The capture was made before daylight, on the 9th November, at 5.35 a. m. The place of the capture was off Masonborough inlet, or, perhaps, a little to the north of it. The distance from Masonborough inlet to New inlet is at least fifteen and one-quarter miles. The wrecks of the Venus and Hebe were seven and one-quarter miles south of Masonborough inlet, and, of course, eight miles north of New inlet. Fort Fisher is on the site of the old light-house; at the north entrance of New inlet. The day rendezvous of the fleet was at a buoy which was five miles S. E. by E. ½ E. from Fort Fisher, and fifteen miles south of Masonborough inlet. As to the Shenandoah, the result of all the testimony is, that she was five miles from the shore, and, on the most favorable view to her, at least eight miles south from Masonborough inlet, at the time of the capture. None of the petitioning vessels were as near as the Shenandoah. None of the petitioning vessels knew of the capture until they saw the Niphon and her prize at daylight. The Niphon fired seven guns at the chase, before the capture. These were thirty-two-pounders and a rifled twenty-pounder. There was a fresh breeze from the north; yet the reports of none of these guns were heard by any of the petitioning vessels, nor were their flashes seen. The steamer Daylight seems to have been as far south as New Inlet bar, and the Tuscarora at least two miles south of the buoy, and the Houqua a

considerable distance south of the Shenandoah, at daybreak. If, therefore, the Shenandoah was not within signal distance, none of them were.

(The remaining question was, how far the Coston signals can be seen at a time like this. On that point, each party selected three officers of the navy, as experts, and the testimony of the six was before the court, and fully considered. The important question put was, "Suppose the signals given to consist of two or three colors, and to report several numbers in succession: please to state how far, under the most favorable circumstances, such signals can be read and understood with satisfactory exactness." The learned judge said the experts differed as much as the parties. Three of them limited the distance to between four and five miles. One put it at six miles, and two at between eight and ten miles. The three who had had the most experience of the Coston signals, put the distance at four and one-half, five, and six miles, as the extreme. On the whole, the judge was of opinion that it was not satisfactorily established that the Coston signals could be read and understood, under the most favorable circumstances, at a distance of eight miles, and that was the least distance at which any of the petitioning vessels was proved to have been. He gave no opinion at what less distance they could be read.)

The result of the testimony is that the Shenandoah, the nearest of the petitioning vessels, was at least eight miles distant. No signals were in fact made. It is not established that the Coston signals can be intelligently read at that distance under the most favorable circumstances. Moreover, the circumstances were not favorable. The witnesses from the Shenandoah, as well as the Niphon, show that there was a haze along the horizon, which the experts say contracts the distance for intelligent vision of colored lights.

The petitions of the Shenandoah, Daylight, Tuscarora, and Houqua to share in the prize are rejected; and the net proceeds are adjudged one-half to the Niphon, and one-half to the United States.