## THE MANGROVE PRIZE MONEY.[1]

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF FLORIDA.

Nos. 24, 34. Argued January 7, 8, 9, 1903.—Decided February 23, 1903.

Vessels more than five miles apart *held* not to be within signal distance so
as to be entitled to share in prize under the circumstances of this case.
Vessels not within signal distance are not "vessels making the capture"
within Rev. Stat. § 4630, although they may have contributed remotely to
this result. They cannot be taken into account in estimating the rela-
tive force of capture and prize. In estimating the relative strength of
the captured and capturing vessels, the means possessed by the captured
vessel, and not the use made of them, must be considered.

THE case is stated in the opinion of the court.

*Mr. Assistant Attorney General Hoyt* for the United States.

*Mr. William B. King,* with whom *Mr. George A. King* was
on the brief, for the officers and crew of the Indiana.

*Mr. James H. Hayden,* with whom *Mr. Joseph K. McCam-
mon* was on the brief, for the officers and crew of the New York.

*Mr. Benjamin Micou* and *Mr. Hilary A. Herbert,* with
whom *Mr. Jefferson B. Browne* was on the brief, for the of-
ficers and crew of the Mangrove.

MR. JUSTICE HOLMES delivered the opinion of the court.

These are appeals from a decree of the United States Dis-
trict Court distributing the proceeds of the Spanish steamer
Panama, condemned by an earlier decree as prize of war. 176
U. S. 535. The District Court awarded the whole net proceeds
to the officers and crew of the United States steamer Man-
grove, on the ground that the Mangrove was the sole capturing

---

[1] Docket titles—No. 24. *United States* v. *Officers and Crew of the U. S.
Steamer Mangrove.* No. 34. *Officers and Enlisted men of the U. S. Ships
New York, Indiana and Wilmington* v. *Officers and Crew of the U. S. Steamer
Mangrove.*

vessel, that the prize was of superior or equal force, and that no other vessel was within signal distance. U. S. Rev. Stat. § 4630 (repealed by act of March 3, 1889, c. 413, § 13, 30 Stat. 1007), § 4632. The United States appeals, contending that the Mangrove alone was of force superior to the Panama, and also that the Indiana, Wilmington and New York were within signal distance, and that the Indiana at least was a joint captor, and that therefore, by § 4630, one half the proceeds should go to the United States. The Indiana appeals, taking the ground that the Mangrove was the sole captor and of force inferior to the Panama, but that the Indiana was within signal distance and in such condition as to be able to render effective aid if required, and therefore entitled to share in the prize by § 4632. The New York and the Wilmington appeal on like ground.

The case turns upon findings of fact, and the question is whether it is clear that the District Court and the experienced naval prize commissioner were wrong. *The Grace Girdler,* 7 Wall. 196, 204. But of course we do not leave out of sight the fact that much additional evidence has been put in since the trial below. We take up first the case of the Indiana. Without discussing the details of the contradictory testimony, we will state the facts that seem to us proved.

At seven minutes after six in the evening of April 25, 1898, off Havana, the Panama, having been brought to by a shot across her bow and notice that she would be fired into if she did not stop, was boarded by Ensign Dayton from the Mangrove. At this moment the capture was complete. *The Grotius,* 9 Cranch, 368, 370. The Panama did not attempt or, so far as appears, intend, resistance or escape. The captain was told that he was a prize, war having been declared between the United States and Spain, and he acquiesced. Thereafter the Panama proceeded, with Ensign Dayton on board, under orders from the Mangrove. Her colors were not hauled down, or a prize crew put aboard until later, but under the circumstances these facts seem to us controlled by others which we have mentioned. It may be added that the officers of the Mangrove seem to have considered it usual for prizes to fly their ensign until they were adjudicated by the prize court, which would

account for their not ordering the flag lowered.—Thirty-eight minutes later, at forty-five minutes after six, the Indiana, which had been approaching from an opposite direction, fired a shot across the bow of the Panama and sent a prize crew aboard. (We should remark in passing that this crew was subject to the orders of Ensign Dayton, the prize master, and seems to have been put aboard at the request of the Mangrove, which had not men enough to spare.) The officer who fired the gun says that he estimated the range at forty-five hundred yards, and that the shot being accurate, the distance from the Panama was about forty-eight hundred yards. This was the estimate formed by the expert on the spot, at the time, for purposes of immediate action, when it was necessary to be accurate. Whatever it was, it was verified by the result of the shot, so that really the only question is whether it is remembered correctly, which there is no reason to doubt. It seems to us to outweigh all other estimates formed after the event by witnesses who had no similar duty. At this time the Mangrove was abreast or a little astern of the Panama.

The previous situations of the ships were as follows: All the United States vessels concerned in this cause were on blockade off Havana. At 4.30 P. M. the Indiana signaled the Mangrove and gave her orders to proceed to Key West after receiving mail. The Mangrove started for Key West before five. At five or ten minutes after five, and until 5.48, when her speed slackened, the Indiana went ahead at full speed toward the flagship New York, in an almost opposite direction from that taken by the Mangrove. At a quarter past five she sighted a strange vessel, which turned out to be the Panama, to the northeast. At 5.52 the flagship signaled "What colors does strange vessel carry?" and was answered at 5.55 "Cannot see." At about six the Indiana was turned toward the Panama and went at full speed, and later at best speed possible until 6.45, when she fired the shot and stopped. The Indiana when she turned at six did not attempt to signal the Mangrove, and five minutes earlier could not see the colors of the Panama, although the Spanish flag was three times the size of the Mangrove's signal flag. It appears from the steam log of the Indiana that a few

days later she made 10.15 knots per hour for two consecutive hours. Taking the time during which the Indiana and Mangrove had been moving away from each other, and their probable speed, or, again, taking the distance at which the Indiana was from the Panama and Mangrove when she fired her shot, and the fact that she had been making for them at full speed for the greater part of forty-five minutes, while they during a part of the same time were sailing toward her at a rate of eight knots, we think it probable, without going into nice calculations, that at six o'clock she must have been twelve or fifteen miles away at the least, as was found by the District Court. From six, when she turned, to seven minutes past six, when the Panama was taken, the Indiana cannot have got to full speed or gone far. The Panama had been stopped.

There is much testimony that the capture was seen from the Indiana, while the officers of the Mangrove say that the Indiana could not be seen by them. We do not attempt to determine precisely how much could be seen or was seen from the higher ship. That testimony must reconcile itself as best it may with the foregoing facts, which we deem not open to dispute. And on those facts we are of opinion that the Indiana was not within signal distance of the Mangrove when the capture took place. We agree with the counsel for the appellees that this view is confirmed by the log of the Indiana and by her claim as first filed, which indicates that at that time her rights were supposed to be founded on the shot fired by her, and the hauling down of the Panama's colors thereupon. It is unnecessary to advert to further confirmatory details.

We need not consider whether, in order to bring a claimant within signal distance, mutual communication must be possible, or whether it is enough if signals from the vessel making the capture could be seen by the claimant. Taking it the latter way, still the words "within signal distance" must be read in connection with the further words "under such circumstances and in such condition as to be able to render effective aid, if required." The whole sentence refers to the actual conditions of this particular case, not to an abstract objective criterion of ideal signal distance in general. See *The Ella and Anna*, 2

Sprague, 267, 273; *S. C.*, 8 Fed. Cas. No. 4368. The Mangrove had no signal flags but boat flags, about three feet by four, the usual signal flags being about eight feet by eleven. Under such circumstances we think it probably would be safe to assume five miles as an outside limit of signal distance in this instance, if the facts heretofore found by us rendered it necessary to be so nice. It is argued, to be sure, that gun signals would have been possible. As to this suggestion we deem it enough to say that we see no reason to believe that it was a practical working possibility under the circumstances, and therefore need not consider whether this statute would be satisfied by anything less than the possibility of reading the ordinary day signals, in the case at bar.

The claims of the New York and the Wilmington fall with that of the Indiana. If she was not within signal distance of the Mangrove they were not, and, as we are about to show, can make no claim on the ground that the Indiana was a joint captor and that they were within signal distance of her.

A part of the argument for the United States also is disposed of by what we have said. If none of the other vessels were within signal distance of the Mangrove none of them were " vessels making the capture " within the meaning of § 4630. The phrase must be taken to be used in that section in the same sense in which it is used in § 4632, where it is opposed to vessels within signal distance and is defined as meaning " vessels present at and rendering actual assistance in the capture." It cannot be contended that vessels too far away to share in the prize as being within signal distance can share under the more immediate title of vessels making the capture, on the ground of some more remote contribution to the result. Vessels within signal distance and able to render effective aid are let in, it is true, presumably because they are taken to contribute to the result, but a more remote contribution is excluded. See *The Cherokee*, 2 Sprague, 235; *The Atlanta*, 2 Sprague, 251; *S. C.*, 3 Wall. 425; *The Ella and Anna*, 2 Sprague, 267; *S. C.*, 8 Fed. Cas. No. 4368 and *n.*

It follows that these vessels cannot be taken into account in estimating the relative force of captor and prize. Undoubtedly

it is likely that the Panama must have known when it left New York that war and a blockade of Havana were probable, and when it was stopped by the Mangrove, whatever it saw or did not see, it may have conjectured that other vessels were not far off. But, as we have said, these less immediate influences are laid out of account by the act.

We may admit with regard to the question just discussed and that to which we now address ourselves, that it is impossible not to feel that the prize law had in mind a different kind of case from this. To catch a blockade runner or a vessel not even informed of the blockade, in either case a vessel not expecting to fight and having shrewd ground to believe that to do so would be to bring down upon herself an overwhelming force, is not the desperate venture which the statute was framed to encourage. But some rather weak cases must fall within any law which is couched in general words. There is no denying that the Pamana was of force superior to the Mangrove. She was of 1432 tons register, with a crew of seventy-one. She had substantially what was required by her contract as a mail steamship with the Spanish government, viz., two Hontoria nine centimetre guns with thirty round of shot for each, one Maxim gun on the bridge, two signal guns, twenty Remington rifles and ten Mauser rifles, all with ammunition, also bayonets and swords. The Mangrove was a steel screw lighthouse tender of not more than eight hundred tons, with a crew of thirty men, and with two six-pound guns, and no small arms or cutlasses. The Panama also was much the faster boat of the two.

The Panama's armament was taken on board under contract with the Spanish government for her own defence, and was fit for hostile use. *The Panama*, 176 U. S. 548, 549. We must assume that if the master had thought that there was a fair chance of success, he would have shown fight. The fact that he did not, and that he probably had made up his mind not to before he saw the Mangrove, and therefore was not ready for action at the moment, does not change the result. If we cannot take the blockading squadron or the battleship Indiana in account as part of the capturing force, we cannot

take them into account as motives. If the master was a timid man, who would not have dared to fight under any circumstances, there would have been the same certainty of surrender to one who knew the whole situation, but the law would have looked only to the force, and would not have gone into psychology. It would not matter that, because of his timidity, the breech blocks of the guns were left stowed below. If he had the materials for resistance and the chance to use them, that is as far as the law would inquire. So here. As was said by Judge Sprague, we must " consider the means the vessels possessed, and not the use they made of them." *The Atlanta,* 2 Sprague, 251, 258. The adventure of the Mangrove may not have been a brilliant event that will live in story, but it was sufficient to give its officers and crew the profit of the law. It is decided that the Panama was lawful prize, and the case does not fall within the class in which the United States takes half.

*Decree affirmed*