# THE BUENA VENTURA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF FLORIDA.

No. 106. Argued November 1, 2, 1899. — Decided December 11, 1899.

In the fourth clause of the President's proclamation of April 26, 1898, issued after the declaration of war against Spain by Congress, April 25, 1898, it was said: "4. Spanish merchant vessels in any ports or places within the United States, shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places, and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage if, on examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term; *provided*, that nothing herein contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage), or any other article prohibited or contraband of war, or any dispatch of or to the Spanish Government." The Buena Ventura, a Spanish vessel, being at Cuba in March, 1898, was chartered to proceed with all convenient speed to Ship Island, Mississippi, and there to take on board a cargo of lumber for Rotterdam. Under this charter she arrived at Ship Island in the latter part of March, 1898, and took on a cargo of lumber for Rotterdam. She cleared at the custom house on the 14th of April accordingly, but was detained by low water until April 19, when, between 8 and 9 A.M., she proceeded on her voyage. While so proceeding she was captured by a man of war of the United States about ten miles off the Florida coast. Up to the moment of capture all her officers were ignorant of the existence of a state of war, and the vessel, at the time of her capture, was following the ordinary course of her voyage. After hearing in the District Court of the United States the Buena Ventura was condemned and sold under a decree of court, and the proceeds were deposited to abide the event of an appeal from that decree. *Held;*

(1) That an innocent vessel like the Buena Ventura, which had loaded within a port of the United States, and had sailed therefrom before the commencement of the war, was entitled, under the proclamation, to continue its voyage, that being clearly within the intention of the President, under the liberal construction which this court is bound to give to that document;

(2) That the reversal of the judgment below, condemning the Buena Ventura, should be without costs or damages in her favor;

(3) That the moneys arising from the sale of the vessel must be paid to the claimant, deducting only the expenses properly incident to her custody and preservation up to the time of sale.

Statement of the Case.

DURING the late war between the United States and Spain, and on May 27, 1898, the District Court of the United States for the Southern District of Florida condemned the steamship Buena Ventura as lawful prize of war, on the ground "that the said steamship Buena Ventura was enemy's property, and was upon the high seas and not in any port or place of the United States upon the outbreak of the war, and was liable to condemnation and seizure." It was thereupon ordered that the vessel "be condemned and forfeited to the United States as lawful prize of war; but it appearing that the cargo of said steamer was the property of neutrals and not contraband and subject to condemnation and forfeiture, it is ordered that said cargo be released and restored to the claimant or the true and lawful owners thereof."

The vessel was captured on April 22, 1898, eight or nine miles from Sand Key light, on the Florida coast, by the United States ship of war Nashville, under the command of a line officer of the United States Navy, was brought into the port of Key West for adjudication, and was condemned upon the answers, given by the master and mate of the steamship, to standing interrogatories *in preparatorio*, and upon the documents seized on board the ship by the captors. This evidence showed that the steamship was a Spanish vessel engaged exclusively in the carrying of cargoes, and that at the time of her capture she was making a voyage under a charter party which had been concluded in Liverpool on March 23, 1898, between the agents of the owners and the agents of the charterers. By this charter party the steamship was described as "now ready to leave Cuba;" and it was agreed upon therein that the vessel should with all convenient speed proceed to Ship Island, Mississippi, and there take on a cargo of lumber, and proceed therewith, as customary, to Rotterdam. The vessel was to be at her loading place and ready for cargo on or before the 10th of April, and if she were not, the charterers had the option of cancelling the charter. Pursuant to this charter party the ship left Cuba and arrived at Ship Island about the 31st of March, and between that time and the 19th of April she had taken on her cargo, and on the

latter day had sailed from Ship Island bound for Norfolk, Virginia, to take in bunker coal, the charter party giving the vessel the liberty to stop at any port on the voyage for coal, then to proceed to Rotterdam. After leaving port at Ship Island she proceeded on her voyage to Norfolk, and about half-past seven o'clock on the morning of April 22, while proceeding close to the Florida reefs, was captured as stated. She made no resistance at the time of her capture, there were no military or naval officers on board of her, and she carried no arms or munitions of war. The evidence is undisputed that the vessel, when captured, was proceeding on her voyage to Norfolk.

Previous to sailing from Ship Island she was furnished with a bill of health, in which it was stated that she was now "ready to depart from the port of Pascagoula, Mississippi, [which is the customs port of Ship Island,] for Norfolk, Virginia, and other places beyond the sea." Her manifest showed that she was bound for Norfolk. It is headed "Coast Manifest," and after a description of the cargo it continues: "Permission is hereby granted to said vessel to proceed from this port to Norfolk, in the district of Norfolk and State of Virginia, to lade bunker coal;" and it was signed and sealed by the deputy collector of Pascagoula, district of Pearl River, Mississippi, on April 14, 1898, and the fees therefor paid.

The ship's clearance was for Norfolk, and contained the same permission to proceed there, to lade bunker coal.

There was no evidence which tended to throw any suspicion as to the destination of the vessel.

After obtaining all of her papers in the regular way, and having cleared at the custom house on April 14, 1898, she was detained at Ship Island by low water until between eight and nine o'clock A. M. of April 19, 1898, when she sailed over the bar and proceeded on her voyage.

In the test affidavit of the master he swore that at all times before the ship's seizure he and all of his officers were ignorant that war existed between Spain and the United States, and the vessel at the time of her capture was following the ordinary course of her voyage,

The various proceedings of Congress, proclamations of the President, letters of the Secretary of State, and other public documents connected with occurrences leading up to the breaking out of hostilities between this country and Spain are contained in this record, but are also set forth at sufficient length in the statement of facts contained in the report of the case of *The Pedro, ante* 355, and it is unnecessary, therefore, to repeat them.

After a hearing the District Court on the 27th of May, 1898, condemned the vessel, 87 Fed. Rep. 927, which was sold under the final decree of the court, and her proceeds deposited to abide the event of an appeal, which was then taken on the part of the claimant.

*Mr. J. Parker Kirlin* for appellant.

*Mr. Assistant Attorney General Hoyt* for the United States.

*Mr. Joseph K. McCammon* and *Mr. James H. Hayden,* for the naval captors, were on Mr. Hoyt's brief.

*Mr. George A. King* and *Mr. William B. King* filed a brief for certain captors.

MR. JUSTICE PECKHAM, after stating the facts as above, delivered the opinion of the court.

The Buena Ventura was a Spanish merchant vessel in the peaceful prosecution of her voyage to Norfolk, Virginia, from Ship Island, in the State of Mississippi, when, on the morning of April 22, 1898, she was captured as lawful prize of war, of the existence of which, up to the moment of capture, all her officers were ignorant. She was not violating any blockade, carried neither contraband of war nor any officer in the military or naval service of the enemy, nor any dispatch of or to the Spanish Government, and attempted no resistance when captured.

The facts regarding this vessel place her within that class

which this Government has always desired to treat with great liberality. It is, as we think, historically accurate to say that this Government has always been, in its views, among the most advanced of the Governments of the world in favor of mitigating, as to all non-combatants, the hardships and horrors of war. To accomplish that object it has always advocated those rules which would in most cases do away with the right to capture the private property of an enemy on the high seas. 3 Wharton's International Law Digest, § 342. The refusal of this Government to agree to the Declaration of Paris was founded in part upon the refusal of the other Governments to agree to the proposition exempting private property, not contraband, from capture upon the sea.

It being plain that merchant vessels of the enemy carrying on innocent commercial enterprises at the time or just prior to the time when hostilities between the two countries broke out, would, in accordance with the later practice of civilized nations, be the subject of liberal treatment by the Executive, it is necessary when his proclamation has been issued, which lays down rules for treatment of merchant vessels, to put upon the words used therein the most liberal and extensive interpretation of which they are capable; and where there are two or more interpretations which possibly might be put upon the language, the one that will be most favorable to the belligerent party, in whose favor the proclamation is issued, ought to be adopted.

This is the doctrine of the English courts, as exemplified in *The Phœnix*, Spink's Prize Cases, 1, 5, and *The Argo*, Id. p. 52. It is the doctrine which this court believes to be proper and correct.

To ascertain the intention of the Executive we must look to the words which he uses. If the language is plain and clear, and the meaning not open to discussion, there is an end of the matter. If, however, such is not the case, and interpretation or construction must be resorted to for the purpose of ascertaining the precise meaning of the text, it is our duty with reference to this public instrument to make it as broad in its exemptions as is reasonably possible.

If inferences must be drawn therefrom in order to render certain the limitations intended, those inferences should be, so far as is possible, in favor of the claimant in behalf of the owners of the vessel.

The language to justify an exemption of the vessel must, it is true, be found in the proclamation; yet if such language fail to state with entire clearness the full extent and scope of such exemption, thereby making it necessary that some interpretation thereof should be given, it is proper to refer to the prior views of the Executive Department of the Government as evidence of its policy regarding the subject. This is not for the purpose of enlarging the natural and ordinary meaning of the words used in the proclamation, but for the purpose of thereby throwing some light upon the intention of the Executive in issuing the instrument and also to aid in the interpretation of the language employed therein, where the extent or scope of that language is not otherwise entirely plain and clear. A reference to the views that have heretofore been announced by the Executive Department is made in 3 Wharton, *supra,* and it will be found that they are in entire accord with the most liberal spirit for the treatment of noncombatant vessels of the enemy.

We come now to the construction of the instrument. It will be seen that Congress on the 25th of April, 1898, declared war against Spain, and in the declaration it is stated that war had existed since the 21st of April preceding. The President on the 26th of April issued his proclamation regarding the principles to be followed in the prosecution of the war. It is dated the day it was issued. The fourth clause thereof may for convenience be here reproduced, as follows:

"4. Spanish merchant vessels in any ports or places within the United States shall be allowed until May 21st, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage, if, upon examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term: Provided, that nothing herein

contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy; or any coal (except such as may be necessary for their voyage), or any other article prohibited or contraband of war, or any dispatch of or to the Spanish Government."

What is included by the words "Spanish merchant vessels in any ports or places within the United States shall be allowed until May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places"? At what time must these Spanish vessels be "in any ports or places within the United States" in order to be exempt from capture? The time is not stated in the proclamation, and therefore the intention of the Executive as to the time must be inferred. It is a case for construction or interpretation of the language employed.

That language is open to several possible constructions. It might be said that in describing Spanish merchant vessels in any ports, etc., it was meant to include only those which were in such ports on the day when the proclamation was issued, April 26. Or it might be held (in accordance with the decision of the District Court) to include those that were in such ports on the 21st of April, the day that war commenced, as Congress declared. Or it might be construed so as to include not alone those vessels that were in port on that day, but also those that had sailed therefrom on any day up to and including the 21st of May, the last day of exemption, and were, when captured, continuing their voyage, without regard to the particular date of their departure from port, whether immediately before or subsequently to the commencement of the war or the issuing of the proclamation.

The District Judge, before whom several cases were tried together, held that the date of the commencement of the war (April 21) was the date intended by the Executive; that as the proclamation of the 22d of April gave thirty days to neutral vessels found in blockaded ports, it was but reasonable to consider that the same number of days, commencing at the outbreak of the war, should be allowed so as to bring it to the 21st of May, the day named; that although a retrospective

effect is not usually given to statutes, yet the question always is, what was the intention of the legislature?

He also said that "the intention of the Executive was to fully recognize the recent practice of civilized nations, and not to sanction or permit the seizure of the vessels of the enemy within the harbors of the United States at the time of the commencement of the war, or to permit them to escape from ports to be seized immediately upon entering upon the high seas." (See preamble to proclamation.)

In the Buena Ventura, the case at bar, the District Judge held that her case "clearly does not come within the language of the proclamation."

It is true the proclamation did not in so many words provide that vessels which had loaded in a port of the United States and sailed therefrom before the commencement of the war should be entitled to continue their voyage, but we think that those vessels are clearly within the intention of the proclamation under the liberal construction we are bound to give to that document.

An intention to include vessels of this class in the exemption from capture seems to us a necessary consequence of the language used in the proclamation when interpreted according to the known views of this Government on the subject and which it is to be presumed were the views of the Executive. The vessel when captured had violated no law, she had sailed from Ship Island after having obtained written permission, in accordance with the laws of the United States, to proceed to Norfolk in Virginia, and the permission had been signed by the deputy collector of the port and the fees therefor paid by the ship. She had a cargo of lumber, loaded but a short time before the commencement of the war, and she left the port but forty-eight hours prior to that event. The language of the proclamation certainly does not preclude the exemption of this vessel, and it is not an unnatural or forced construction of the fourth clause to say that it includes this case.

The omission of any date in this clause, upon which the vessel must be in a port of the United States, and prior to

which the exemption would not be allowed, is certainly very strong evidence that such a date was not material, so long as the loading and departure from our ports were accomplished before the expiration of May 21. It is also evident from the language used that the material concern was to fix a time in the future, prior to the expiration of which vessels of the character named might sail from our ports and be exempt from capture. The particular time at which the loading of cargoes and sailing from our ports should be accomplished was obviously unimportant, provided it was prior to the time specified. Whether it was before or after the commencement of the war, would be entirely immaterial. This seems to us to be the intention of the Executive, derived from reading the fourth clause with reference to the general rules of interpretation already spoken of, and we think there is no language in the proclamation which precludes the giving effect to such intention. Its purpose was to protect innocent merchantmen of the enemy who had been trading in our ports from capture, provided they sailed from such ports before a certain named time in the future, and that purpose would be wholly unaffected by the fact of a sailing prior to the war. That fact was immaterial to the scheme of the proclamation, gathered from all its language.

We do not assert that the clause would apply to a vessel which had left a port of the United States prior to the commencement of the war and had arrived at a foreign port and there discharged her cargo, and had then left for another foreign port prior to May 21. The instructions to United States ships, contained in the fourth clause, to permit the vessels "to continue their voyage" would limit the operation of the clause to those vessels that were still on their original voyage from the United States, and had taken on board their cargo (if any they had) at a port of the United States before the expiration of the term mentioned. The exemption would probably not apply to such a case as *The Phœnix*, (Spink's Prize Cases, 1). That case arose out of the English Order in Council, made at the commencement of the Crimean war. The vessel had sailed from an English port in the middle of

February, 1854, with a cargo, bound for Copenhagen, and having reached that port and discharged her cargo by the middle of March, she had sailed therefrom on the 10th of April, bound to a foreign port, and was captured on the 12th of April while proceeding on such voyage. The Order in Council was dated the 29th of March, 1854, and provided that "Russian merchant vessels, in any ports or places within her Majesty's dominions, shall be allowed until the tenth day of May next, six weeks from the date hereof, for loading their cargoes and departing from such ports or places," etc. The claim of exemption was made on the ground that the vessel had been in an English port, and although she sailed therefrom in the middle of February to Copenhagen and had there discharged her cargo, before the Order in Council was promulgated, yet it was still urged that she was entitled to exemption from capture. The court held the claim was not well founded, and that it could not by any latitude of construction hold a vessel to have been in an English port on the 29th of March, which on that day was lying in the port of Copenhagen, having at that time discharged the cargo which she had taken from the English port. It is true the court took the view that the vessel must at all events have been in an English port on the 29th of March in order to obtain exemption, and if not there on that day, the vessel did not come within the terms of the order and was not exempt from capture. From the language of the opinion in that case it would seem not only that a vessel departing the day before the 29th of March would not come within the exemption, but that a vessel arriving the day after the 29th, and departing before the 10th of May following, would also fail to do so; that the vessel must have been in an English port on the very day named, and if it departed the day before or arrived the day after, it was not covered by the order.

The French Government also, on the outbreak of the Crimean war, decreed a delay of six weeks, beginning on the date of the decree, to Russian merchant vessels in which to leave French ports. Russia issued the same kind of a decree, and other nations have at times made the same provisions. It is

claimed that they confine the exemption to vessels that are actually within the ports of the nation at the date of issuing the decree or order.

We are not inclined to put so narrow a construction upon the language used in this proclamation. The interpretation which we have given to it, while it may be more liberal than the other, is still one which may properly be indulged in.

If this vessel, instead of sailing on the 19th, had not sailed until the 21st of April, the court below says she would have been exempt from capture. In truth, she was from her character and her actual employment just as much the subject of liberal treatment, and was as equitably entitled to an exemption when sailing on the 19th, as she would have been had she waited until the 21st. No fact had occurred since her sailing which altered her case in principle from the case of a vessel which had been in port on, though sailing after, the 21st. To attribute an intention on the part of the Executive to exempt a vessel if she sailed on or after the 21st of April, and before the 21st of May, and to refuse such exemption to a vessel in precisely the same situation, only sailing before the 21st, would, as we think, be without reasonable justification. It may safely be affirmed that he never had any such distinction in mind and never intended it to exist. There is nothing in the nature of the two cases calling for a difference in their treatment. They both alike called for precisely the same rule, and if there be language in the clause or proclamation from which an inference can be drawn favorable to the exemption, and none which precludes it, we are bound to hold that the exemption is given. We think the language of the proclamation does permit the inference and that there is none which precludes it.

We are aware of no adjudications of our own court as to the meaning to be given to words similar to those contained in the proclamation, and it may be that a step in advance is now taken upon this subject. Where, however, the words are reasonably capable of an interpretation which shall include a vessel of this description in the exemption from capture, we are not averse to adopting it, even though this court may be the first to do so. If the Executive should hereafter be inclined

to take the other view, the language of his proclamation could be so altered as to leave no doubt of that intention, and it would be the duty of this court to be guided and controlled by it.

Deciding as we do in regard to the fourth clause, it becomes unnecessary to examine the other grounds for a reversal discussed at the bar.

The question of costs then arises. We had occasion in *The Olinde Rodrigues*, 174 U. S. 510, to examine that question in relation to the existence of probable cause for making the capture. In that case it was held that such probable cause did exist, and although the facts therein proved did not commend the vessel to the favorable consideration of the court, yet upon a careful review of the entire evidence we held that we were not compelled to proceed to the extremity of condemning the vessel. Restitution was, therefore, awarded, but without damages. Payment of the costs and expenses incident to her custody and preservation, and of all costs in the case except the fees of counsel, were imposed upon the ship.

In this case, but for the proclamation of April 26, the ship would have been liable to seizure and condemnation as enemy's property. At the time of seizure, however, (April 22,) that proclamation had not been issued, and hence there was probable cause for her seizure, although the vessel was herself entirely without fault. The subsequent issuing of the proclamation covering the case of a vessel situated as was this one took away the right to condemn which otherwise would have existed. Thus, at the time of seizure, both parties, the capturing and the captured ship, were without fault, and while we reverse the judgment of condemnation and award restitution, we think it should be without damages or costs in favor of the vessel captured.

*The ship having been sold, the moneys arising from the sale must be paid to the claimant without the deduction of any costs arising in the proceeding, but after deducting the expenses properly incident to her custody and preservation up to the time of her sale, and it is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE GRAY and MR. JUSTICE McKENNA dissented.