# THE PANAMA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 127. Argued November 3, 1899. — Decided February 26, 1900.

No general rule of international law exempts mail ships from capture as prize of war.

A Spanish mail steamship, carrying mail of the United States from New York to Havana at the time of the breaking out of the recent war with Spain, was not exempt from capture by the sixth clause of the President's proclamation of April 26, 1898.

At the time of the breaking out of the recent war with Spain, a Spanish mail steamship was on a voyage from New York to Havana, carrying a general cargo, passengers and mails, and having mounted on board two breech-loading Hontoria guns of nine centimetre bore, and one Maxim rapid-firing gun, and having also on board twenty Remington rifles and ten Mauser rifles, with ammunition for all the guns and rifles, and thirty or forty cutlasses. Her armament had been put on board more than a year before, for her own defence, as required by her owner's mail contract with the Spanish Government, which also provided that, in case of war, that government might take possession of the vessel with her equipment, increase her armament, and use her as a war vessel, and, in these and other provisions, contemplated her use for hostile purposes in time of war. *Held*, that she was not exempt from capture as prize of war by the fourth clause of the President's proclamation of April 26, 1898.

THE statement of the case will be found in the opinion of the court.

*Mr. J. Parker Kirlin* for appellant.

*Mr. Assistant Attorney General Hoyt* for appellees. *Mr. Joseph K. McCammon* and *Mr. James H. Hayden*, of counsel for the captors, were on his brief.

*Mr. George A. King* and *Mr. William B. King*, solicitors for certain captors, filed a brief on their behalf.

MR. JUSTICE GRAY delivered the opinion of the court.

This was a libel for the condemnation of the steamship Panama as prize of war, and was heard in the District Court upon the libel, the claim of the master in behalf of the owner of the vessel, and the depositions *in preparatorio* of her master, her supercargo, and her chief engineer, which showed the following state of facts:

The Panama was a steamship of 1432 tons register; was owned by the Compania Transatlantica, a corporation of Barcelona in Spain; sailed under the Spanish flag; had a commission as a royal mail ship from the Government of Spain; carried a crew of 71 men all told, who had been shipped at different times at Havana; and her usual course of voyage included the ports of New York and Havana, and Progreso, Vera Cruz and other Mexican ports, with general cargoes, passengers and mails.

Her last voyage began in Havana, for a round trip by way of New York, and was to have ended in Vera Cruz. She sailed from New York at half past two o'clock in the afternoon of April 20, 1898, with à clearance from the custom-house at that port for Havana, Progreso, and Vera Cruz, having on board the United States mails, 29 passengers (all Spaniards except one Frenchman) and a general cargo, the produce or manufacture of the United States, shipped at New York, and to be delivered, at the risk of the shippers, to consignees at those ports. She pursued the usual course of ships bound southward-along the coast until she passed Alligator Reef light on the coast of Florida, and then bore away for Havana, and sighted the Cuban coast on the morning of April 25 ; and on that day, when about twenty-five miles from Havana, was captured by the United States ship of war Mangrove, and was sent in charge of a prize crew into Key West. She had no military or naval officer on board, made no resistance to the capture, and delivered all her papers and mails to the prize master.

There were mounted on board the Panama, at the time of her capture, five guns: Two breech-loading Hontoria 9 centimetre guns, one on each side of the ship, with 30 rounds of shot for each ; one Maxim rapid-firing gun, on the bridge, with ammunition ; and two signal guns, one on each side of the pilot house, with ammunition. She also had on board about twenty Remington rifles, and ten Mauser rifles, with ammunition for each, and about thirty or forty cutlasses. The cannon had been put on board about three years before, and the small arms and ammunition had been on board a year or more. She was so armed in accordance with a contract with the Spanish Government, which required all the mail steamships of the company to be armed, and article 26 of which was as follows: "Every ship shall take on board, for her own defence, the following armament: Two Hontoria 9 centimetre guns, with powder and ammunition for 30 shots for each piece ; twenty Remington rifles, with 100 rounds apiece, and bayonet or sword-bayonet ; and twenty cutlasses."

The master of the Panama moved the court to allow further

proof upon the matters set forth in two test affidavits, filed by leave of the court, in which he testified more distinctly that the mounted guns and small arms which the Panama carried had not been shipped for the purpose of war, or in expectation of hostilities between the Spanish Government and the United States, but were taken on board pursuant to the requirements of that contract; and also testified that the Spanish Government had never taken possession of the Panama under the terms of the contract; and that until the capture he and his officers were ignorant of the existence of the war between Spain and the United States, and of any blockade of the port of Havana. And he asked leave to submit to the court the whole contract, as contained in a printed book, which was in the chart room of the Panama, and in the custody of the prize master, and which has since been sent up to this court as one of the exhibits in the cause.

By that contract, concluded between the Spanish Government and the Compania Transatlantica on November 18, 1886, and drawn up and printed in Spanish, the company bound itself to establish and to maintain for twenty years various lines of mail steamships, one of which included Havana, New York and other ports of the United States and of Mexico; and the Spanish Government agreed to pay certain subsidies to this company, and not to subsidize other steamship lines between the same points. Among the provisions of the contract, besides article 26, above quoted, were the following:

By article 25, new ships of the West Indian line must be of iron, or of the material which experience may prove to be the best; must have double-bottomed hulls, divided into water-tight compartments, with all the latest improvements known to the art of naval construction; and "their deck and sides shall have the necessary strength to support the artillery that they are to mount." All the ships of that line must have a capacity for 500 enlisted men on the orlop deck, and a convenient place for them on the main deck. The company, when beginning to build a new ship, shall submit to the Minister of the Colonies her plans as prepared for commercial and postal service; "the Minister shall cause to be studied the measures

that should be taken looking to the rapid mounting in time of war of pieces of artillery on board of said vessel; and may compel the company to do such strengthening of the hull as he may deem necessary for the possible mounting of that artillery; said strengthening shall not be required for a greater number than six pieces whose weight and whose force of recoil do not exceed those of a piece of fourteen centimetres." The plans of ships already built shall be submitted to the Minister of Marine, in order that he may cause to be studied the measures necessary to adapt them to war service; and any changes that he may deem necessary or possible for that end shall be made by the company. But in both old and new ships the changes proposed by the Ministry must be such as not to prejudice the commercial purposes of the vessels.

By article 35, the vessels, with their engines, armaments and other appurtenances, must be constantly maintained in good condition for service.

By article 41, the officers and crews of the vessels, and, as far as possible, the engineers, shall be Spaniards.

By article 49, the company may employ its vessels in the transportation of all classes of passengers and merchandise, and engage in all commercial operations that will not prejudice the services that it must render to the State.

By article 60, when by order of the Government munitions of war shall be taken on board, the company may require that it shall be done in the manner and with the precautions necessary to avoid explosions and disasters.

By article 64, in case of the suspension of the mail service by a naval war, or by hostilities in any of the seas or ports visited by the company's ships, the Government may take possession of them with their equipment and supplies, having a valuation of the whole made by a commission composed of two persons selected by the Government, two by the company, and a fifth person chosen by those four; at the termination of the war, the vessels with their equipment are to be returned to the company, and the Government is to pay to the company an indemnity for any diminution in their value, according to the opinion of the commission, and is also, for

the time it has the vessels in its service, to pay five per cent on the valuation aforesaid. By article 66, at the end of the war, the Government may relieve the company of the performance of the contract if the casualties of the war have disabled it from continuing the service. And by article 67, in extraordinary political circumstances, and though there be no naval war, the Government may charter one or more of the company's vessels, and in that event shall pay an indemnity estimated by the aforesaid commission. · ·

The District Court denied the motion of the master to take further proof; restored parts of the cargo to claimants thereof; gave claimants of other parts of the cargo leave to introduce further proof; and entered a final decree of condemnation and sale of the Panama and the rest of her cargo, upon the ground that she was enemy's property, and was upon the high seas at the time of the President's proclamation exempting certain vessels from arrest. 87 Fed. Rep. 927. The court also, on the application of the commodore commanding at Key West, and on the recommendation of the prize commissioners, ordered all the mounted guns and the ammunition therefor to be appraised by two officers of the Navy, and delivered to the commodore for the use of the Navy Department. The master of the Panama appealed to this court from the decree condemning the vessel.

The recent war with Spain, as declared by the act of Congress of April 25, 1898, c. 189, and recognized in the President's proclamation of April 26, 1898, existed on and after April 21, 1898. 30 Stat. 364, 1770. This proclamation declared, among the rules on which the war would be conducted, the following:

"4. Spanish merchant vessels, in any ports or places within the United States, shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage if, on examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term: Provided, that nothing herein contained shall

apply to Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage) or any other article prohibited or contraband of war, or any despatch of or to the Spanish government."

" 6. The right of search is to be exercised with strict regard for the rights of neutrals, and the voyages of mail steamers are not to be interfered with except on the clearest grounds of suspicion of a violation of law in respect of contraband or blockade."

It has been decided by this court, in the recent case of *The Buena Ventura*, 175 U. S. 384, that a Spanish merchant vessel, which had sailed before April 21, 1898, from a port of the United States on a voyage to a foreign port, not having on board any officer in the military or naval service of Spain, nor any article contraband of war, nor any despatch of or to the Spanish government, was protected by the fourth clause of the President's proclamation of April 26, 1898, from condemnation while on that voyage; but that her capture, before that proclamation was issued, was with probable cause; and that she should therefore be ordered to be restored to her owner, but without damages or costs.

That case would be decisive of this one, but for the mails and the arms carried by the Panama, and the contract with the Spanish Government under which the arms were put on board.

It was argued in behalf of the claimant that, independently of her being a merchant vessel, she was exempt from capture by reason of her being a mail steamship and actually carrying mail of the United States.

There are instances in modern times, in which two nations, by convention between themselves, have made special agreements concerning mail ships. But international agreements for the immunity of the mail ships of the contracting parties in case of war between them have never, we believe, gone farther than to provide, as in the postal convention between the United States and Great Britain in 1848, in that between Great Britain and France in 1833, and in other similar con-

ventions, that the mail packets of the two nations shall continue their navigation, without impediment or molestation, until a notification from one of the governments to the other that the service is to be discontinued; in which case they shall be permitted to return freely, and under special protection, to their respective ports. And the writers on international law concur in affirming that no provision for the immunity of mail ships from capture has as yet been adopted by such a general consent of civilized nations as to constitute a rule of international law. 9 Stat. 969; Wheaton, (8th ed.) pp. 659–661, Dana's note; Calvo, (5th ed.) §§ 2378, 2809; De Boeck, §§ 207, 208. De Boeck, in § 208, after observing that, in the case of mail packets between belligerent countries, it seems difficult to go farther than in the convention of 1833, above mentioned, proceeds to discuss the case of mail packets between a belligerent and a neutral country, as follows: "It goes without saying that each belligerent may stop the departure of its own mail packets. But can either intercept enemy mail packets? There can be no question of intercepting neutral packets, because communications between neutrals and belligerents are lawful, in principle, saving the restrictions relating to blockade, to contraband of war, and the like; the right of search furnishes belligerents with a sufficient means of control. But there is no doubt that it is possible, according to existing practice, to intercept and seize the enemy's mail packets."

The provision of the sixth clause of the President's proclamation of April 26, 1898, relating to interference with the voyages of mail steamships, appears by the context to apply to neutral vessels only, and not to restrict in any degree the authority of the United States, or of their naval officers, to search and seize vessels carrying the mails between the United States and the enemy's country. Nor can the authority to do so, in time of war, be affected by the facts that before the war a collector of customs had granted a clearance, and a postmaster had put mails on board, for a port which was not then, but has since become, enemy's country. Moreover, at the time of the capture of the Panama, this proclamation had not been

issued. Without an express order of the Government, a merchant vessel is not privileged from search or seizure by the fact that it has a government mail on board. *The Peterhoff*, 5 Wall. 28, 61.

The mere fact, therefore, that the Panama was a mail steamship, or that she carried mail of the United States on this voyage, does not afford any ground for exempting her from capture.

The remaining question in the case is whether the Panama came within the class of vessels described in the fourth clause of the President's proclamation of April 26, 1898, as " Spanish merchant vessels," and as not " Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage) or any other article prohibited or contraband of war, or any despatch of or to the Spanish government."

On the part of the claimant, it was argued that the arms which the Panama carried, under the requirements of her mail contract and for the protection of the mails, are not to be regarded as contraband or munitions of war, within the sense of this clause; that "contraband," as therein referred to, means contraband cargo, not contraband portion of the ship's permanent equipment; and that, if the furnishings of a ship could be regarded as contraband, every ship would have contraband on board.

On the other hand, it was contended, in support of the condemnation, that the arms which the Panama carried, belonging to her owner, were contraband of war, and rendered her liable to capture; and that by reason of her being so armed, and of the provisions of her mail contract with the Spanish government, requiring her armament, and recognizing the right of that government, in case of a suspension of the mail service by war, to take possession of her for warlike purposes, she cannot be considered as a merchant vessel, within the meaning of the proclamation, but must be treated like any regular vessel of the Spanish navy under similar circumstances.

The claimant much relied on a case decided in 1800 by the French Council of Prizes, in accordance with the opinion and

report of Portalis, himself a high authority. Wheaton, (8th ed.) p. 460; De Boeck, § 81. In the case referred to, an American vessel, carrying ten cannon of various sizes, together with muskets and munitions of war, had been captured by French frigates; and had been condemned by two inferior French tribunals, upon the ground that she was armed for war, and had no commission or authority from her own government. The claimants contended that their ship, being bound for India, was armed for her own defence, and that the munitions of war, the muskets and the cannon that composed her armament did not exceed what was usual in like cases for long voyages. Upon this point, Portalis, acting as commissioner of the French government, reported his conclusion on the question of armament as follows: "For my part, I do not think it is enough to have or to carry arms, to incur the reproach of being armed for war. Armament for war is of a purely offensive nature. It is established when there is no other object in the armament than that of attack, or, at least, when everything shows that such is the principal object of the enterprise; then a vessel is deemed enemy or pirate, if she has no commission or papers sufficient to remove all suspicion. But defence is a natural right, and means of defence are lawful in voyages at sea, as in all other dangerous occupations of life. A ship which had but a small crew, and a considerable cargo, was evidently intended for commerce, and not for war. The arms found on this ship were evidently intended, not for committing acts of rapine or hostility, but for preventing them; not for attack, but for self-defence. The pretext of being armed for war therefore appears to me to be unfounded." The Council of Prizes, upon consideration of the report of Portalis, adjudged that the capture of the vessel and her cargo was null and void, and ordered them to be restored, with damages. *The Pégou*, or *Pigou*, 2 Pistoye et Duverdy, Prises Maritimes, 51; *S. C.* 2 Cranch, 96–98, and note.

But in that case the only question at issue was whether a neutral merchant vessel, carrying arms solely for her own defence, was liable to capture for want of a commission as a vessel of war or privateer. That the capture took place while there

was no state of war between France and the United States is shown by her being treated, throughout the case, as a neutral vessel; if she had been enemy's property, she would have been lawful prize, even if she had a commission, or if she were unarmed. She was not enemy's property, nor in the enemy's possession, nor bound to a port of the enemy; nor had her owner made any contract with the enemy by which the enemy was, or would be, under any circumstances, entitled to take and use her, either for war, or for any other purpose.

Generally speaking, arms and ammunition are contraband of war. In *The Peterhoff*, 5 Wall. 28, Chief Justice Chase, delivering the judgment of this court, said: " The classification of goods as contraband or not contraband has much perplexed text-writers and jurists. A strictly accurate and satisfactory classification is perhaps impracticable; but that which is best supported by American and English decisions may be said to divide all merchandise into three classes. Of these classes, the first consists of articles manufactured, and primarily and ordinarily used, for military purposes in time of war; the second, of articles which may be and are used for purposes of war or peace, according to circumstances; and the third, of articles exclusively used for peaceful purposes. Merchandise of the first class, destined to a belligerent country or places occupied by the army or navy of a belligerent, is always contraband; merchandise of the second class is contraband only when actually destined to the military or naval use of a belligerent; while merchandise of the third class is not contraband at all, though liable to seizure and condemnation for violation of blockade or siege." And it was adjudged that so much of the cargo of the Peterhoff, as consisted of artillery harness, artillery boots, and army shoes and blankets, came fairly under the description of goods primarily and ordinarily used for military purposes in time of war; and, being destined directly for the use of the rebel military service, came within the second, if not within the first class of goods contraband of war. 5 Wall. 58.

Yet it must be admitted that arms and ammunition are not contraband of war, when taken and kept on board a merchant

vessel as part of her equipment, and solely for her defence against " enemies, pirates and assailing thieves," according to the ancient phrase still retained in policies of marine insurance. Pratt, in his essay on the Law of Contraband of War, speaking of the class of "articles which are of direct use in war," says : " With respect to these no questions can arise. On proof of the use of the article being solely or particularly applicable to hostile purposes, the conveyance of it to the enemy would amount to such a direct interposition in the war as necessarily to entail the confiscation of the property." But he afterwards adds this qualification: " But even in the case of articles of direct use in war, an exception is always made in favor of such a quantity of them as may be supposed to be necessary for the use or defence of the ship." And again, speaking of " warlike stores," he says : " These are, from their very nature, evidently contraband ; but every vessel is, of course, allowed to carry such a quantity as may be necessary for purposes of defence ; this provision is expressly introduced in many treaties." Pratt, Contraband of War, xxii, xxv, xl. And at pages 239, 244, 245 of his appendix he quotes express provisions to that effect in the treaties between Great Britain and Russia in 1766, 1797 and 1801. See also *Cases of Dutch and Spanish Ships*, 6 C. Rob. 48 ; *The Happy Couple*, Stewart Adm. (Nova Scotia) 65, 69 ; Madison, quoted in 3 Whart. Int. Law Dig. § 368, p. 313.

But the fact that arms carried by a merchant vessel were originally taken on board for her own defence is not conclusive as to her character. This is clearly shown by the case of *The Amelia*, (1801) reported by the name of *Talbot* v. *Seeman*, 1 Cranch, 1. In that case, during the naval warfare between the United States and France near the end of the last century, a neutral merchant vessel, having eight iron cannon and eight wooden guns mounted on board, and a cargo of merchandise, sailed from Calcutta for Hamburg, both being neutral ports ; and before reaching her destination was captured by a French cruiser; and put by her captors, with the cannon still on board, in charge of a French prize crew, with directions to take her into a French port for adjudication as prize ; and on her way

thither was recaptured by a United States ship of war. The recapture was held to be lawful, and to entitle the recaptors to salvage before restoring the vessel to her neutral owner, because, as Chief Justice Marshall said, " The Amelia was an armed vessel commanded and manned by Frenchmen," " she was an armed vessel under French authority, and in a condition to annoy the American commerce." 1 Cranch, 32. And in *The Charming Betsy*, (1804) 2 Cranch, 64, that case was expressly approved, as a precedent to be followed under similar circumstances; but was held to be inapplicable where the arms on board at the time of the recapture were but a single musket and a small amount of powder and ball. 2 Cranch, 121. Notwithstanding that the Amelia was a neutral vessel, with an armament originally taken on board for defence only, and therefore, while in the possession of her neutral owner, would not (according to the French case above cited) have been liable to capture as an armed vessel, yet, after she had been taken possession of by the enemy, with the same armament still on board, and thus was in a condition to be used by the enemy for hostile purposes, the fact that the original purpose of the armament was purely defensive did not prevent her from being considered as an armed vessel of the enemy.

While the authorities above referred to present principles and analogies worthy of consideration in the case at bar, they furnish no conclusive rule to govern its determination. The decision of this case must depend upon its own facts, and upon the true construction of the President's proclamation.

As to the facts, there is no serious dispute. The matters stated in the test affidavits upon which the motion for further proof was based add nothing of importance to the facts disclosed by the testimony *in preparatorio*, and by the mail contract between her owner and the Spanish Government, which forms part of the ship's papers.

The Panama was a steamship of 1432 tons register, carrying a crew of 71 men all told, owned by a Spanish corporation, sailing under the Spanish flag, having a commission as a royal mail ship from the Government of Spain, and plying from and to New York and Havana and various Mexican ports, with

general cargoes, passengers and mails. At the time of her capture, she was on a voyage from New York to Havana, and had on board two breech-loading Hontoria guns of nine centimetre bore, one mounted on each side of the ship, one Maxim rapid-firing gun on the bridge, twenty Remington rifles and ten Mauser rifles, with ammunition for all the guns and rifles, and thirty or forty cutlasses. The guns had been put on board three years before, and the small arms and ammunition had been on board a year or more. Her whole armament had been put on board by the company in compliance with its mail contract with the Spanish Government, (made more than eleven years before, and still in force,) which specifically required every mail steamship of the company to "take on board, for her own defence," such an armament, with the exception of the Maxim gun and the Mauser rifles.

That contract contains many provisions looking to the use of the company's steamships by the Spanish Government as vessels of war. Among other things, it requires that each vessel shall have the capacity to carry 500 enlisted men; that that government, upon inspection of her plans as prepared for commercial and postal purposes, may order her deck and sides to be strengthened so as to support additional artillery; and that, in case of the suspension of the mail service by a naval war, or by hostilities in any of the seas or ports visited by the company's vessels, the Government may take possession of them with their equipment and supplies, at a valuation to be made by a commission; and shall, at the termination of the war, return them to the company, paying five per cent on the valuation while it has them in its service, as well as an indemnity for any diminution in their value.

The Panama was not a neutral vessel; but she was enemy property, and as such, even if she carried no arms, (either as part of her equipment, or as cargo,) would be liable to capture, unless protected by the President's proclamation.

It may be assumed that a primary object of her armament, and, in time of peace, its only object, was for purposes of defence. But that armament was not of itself inconsiderable, as appears, not only from the undisputed facts of the case, but

from the action of the District Court, upon the application of the commodore commanding at the port where the court was held, and on the recommendation of the prize commissioners, directing her arms and ammunition to be delivered to the commodore for the use of the Navy Department. And the contract of her owner with the Spanish Government, pursuant to which the armament had been put on board, expressly provided that, in case of war, that government might take possession of the vessel with her equipment, increase her armament, and use her as a war vessel; and, in these and other provisions, evidently contemplated her use for hostile purposes in time of war.

She was, then, enemy property, bound for an enemy port, carrying an armament susceptible of use for hostile purposes, and herself liable, upon arrival in that port, to be appropriated by the enemy to such purposes.

The intent of the fourth clause of the President's proclamation was to exempt for a time from capture peaceful commercial vessels; not to assist the enemy in obtaining weapons of war. This clause exempts "Spanish merchant vessels" only; and expressly declares that it shall not apply to "Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage) or any other article prohibited or contraband of war, or any despatch of or to the Spanish Government."

Upon full consideration of this case, this court is of opinion that the proclamation, expressly declaring that the exemption shall not apply to any Spanish vessel having on board any article prohibited or contraband of war, or a single military or naval officer, or even a despatch, of the enemy, cannot reasonably be construed as including, in the description of "Spanish merchant vessels" which are to be temporarily exempt from capture, a Spanish vessel owned by a subject of the enemy; having an armament fit for hostile use; intended, in the event of war, to be used as a war vessel; destined to a port of the enemy; and liable, on arriving there, to be taken possession of by the enemy, and employed as an auxiliary cruiser of the enemy's navy, in the war with this country.

The result is, that the Panama was lawfully captured and condemned, and that the decree of the District Court must be

*Affirmed.*

Mr. Justice Peckham dissented.