SIMON et al. v. MOORE, Collector of Internal Revenue, et al.

(District Court, E. D. Missouri, E. D.   December 5, 1919.)

No. 5218.

INTOXICATING LIQUORS ☞132—EFFECT OF TERMINATION OF WAR ON WAR-TIME PROHIBITION ACT.

Semble, that War-Time Prohibition Act, enacted under the war power of Congress, ceased to be constitutionally effective when the war terminated and demobilization was completed as matter of fact, and in consequence the war power of Congress, under which alone legislation in derogation of the constitutional rights of the states, can be enacted or enforced, likewise ceased.

In Equity. Suit by Julian Simon and others against George H. Moore, Collector of Internal Revenue, and another. On motion to dismiss bill, and by complainants for temporary injunction. Motion to dismiss denied, and injunction granted.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(261 F.)

D. J. O'Keefe and Charles A. Houts, both of St. Louis, Mo., for plaintiffs.

Walter L. Hensley, U. S. Atty., and Benj. L. White, Asst. U. S. Atty., both of St. Louis, Mo., for defendants.

FARIS, District Judge. Plaintiffs by this proceeding seek to enjoin and restrain the defendants, and their agents, employés, and subordinates—

"from in any manner enforcing or attempting to enforce, or causing to be enforced, against the plaintiffs, their officers, agents, servants, employés, and customers, or any of them, any of the pains, penalties, seizures, and forfeitures provided in and by the act of Congress of November 21, 1918 (40 Stat. 1047, c. 212) and of title 1 of the act of Congress of October 28, 1919, and from arresting or prosecuting, or causing to be arrested or prosecuted, the plaintiffs, their officers, agents, servants, employés, and customers, or any of them, for and on account of any alleged violation by them, or any of them, of the terms and provisions of said act of Congress of November 21, 1918, and of title 1 of the act of Congress of October 28, 1919, and that said defendant collector of internal revenue be restrained from refusing to receive from plaintiffs, or any of them, the tax provided by law on the whisky, or any part thereof, belonging, respectively, to the plaintiffs herein, upon which said tax has not been paid, and from interfering with the removal from bond of such whisky, or any part thereof, upon which the tax has been paid, and that plaintiffs may have such other and further relief as to the court may seem just and equitable in the premises."

The matter came on to be heard upon plaintiffs' application for the issuance of a temporary injunction and upon the defendants' motion to dismiss plaintiffs' bill.

Since a similar case has been recently ruled in this jurisdiction—. Griesedieck Bros. Brewery Co. et al. v. Moore, Collector, et al. (No. 5207, in Equity), in this court, which was ruled November 21, 1919, by Pollock, District Judge— and since some 12 or 15 similar cases have been only recently decided in the District Courts of other jurisdictions, at least two of which are now pending on appeal in the Supreme Court of the United States, no reason is known for taking up time and space in reciting aught but a bare skeleton of the pleaded facts. These facts are taken from the verified bill, which, as stated, defendants moved to dismiss, and from affidavits, not controverted, which were offered upon the hearing.

Plaintiffs, as appears from the style of the case, are either partners or corporations, who have been engaged in the city of St. Louis, Mo., for many years as wholesale liquor dealers, and are duly qualified as such under the laws of the United States and of the state of Missouri. Plaintiffs in the aggregate own 43,735 gallons of whisky, of the value of $415,830, and 13,291 gallons of wine, of the value of $32,127, on which (largely, if not wholly, during the year 1919) plaintiffs have been compelled to pay and have paid to the United States as internal revenue taxes the aggregate sum of $220,495.36. In addition to this, plaintiffs in the aggregate own 34,645 gallons of whisky, of the value of $63,312, which are yet in bonded warehouses, and on which no taxes have as yet been paid. All of this whisky was made at a time when by law it was permitted to manufacture whisky.

The act of Congress referred to in the above-quoted excerpt from plaintiffs' petition was approved on the 21st day of November, 1918. It is commonly known as the "War Prohibition Act," and according to its title it was "An act to enable the Secretary of Agriculture to carry out, during the fiscal year ending June 30, 1919, the purpose of the act entitled 'An act to provide further for the national security and defense by stimulating agriculture and facilitating the distribution of agricultural products,' and for other purposes." One of the provisions of the above War Prohibition Act, and that one on which this case largely turns, reads thus:

"*That after June 30, 1919, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States,* * * * it shall be unlawful to sell for beverage purposes any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export."

I have italicized, for the purpose of emphasizing the very point of contention here, the language of the act which I deem decisive of the case. I have skeletonized the section by omitting the conceded war-efficiency-promotive reasons set out in the original act, in order that I may present acutely the bare bone of contention in the instant case.

On the 28th day of October, 1919, the Congress passed, over the President's veto, an act commonly called the "Volstead Act," by the terms of which the War Prohibition Act was retained in full force and effect "until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States." The Volstead Act also provided details and legal machinery for the enforcement of national prohibition after the Eighteenth Amendment shall by efflux of time become effective. Violations of the provisions of the War Prohibition Act are by the Volstead Act made punishable by severe penalties of fine or imprisonment, or both fine and imprisonment. In addition to such fine and imprisonment, or both, other rather far-reaching provisions, mete for the enforcement of the War Prohibition Act, are provided for in the Volstead Act. Substantially, some of these which relate to the powers and duties of defendant Hensley, as district attorney of the United States, are:

"That the defendant United States attorney is vested with the power and charged with the duty of prosecuting criminally for the crimes denounced and defined therein, and in said War Prohibition Act, of any person who violates its terms; and said United States attorney is further vested with the power and charged with the duty of prosecuting criminally, as a maintainer of a public and common nuisance or abetter thereof, any person who maintains or assists in maintaining any room, house, building, boat, vehicle, structure or place of any kind, where any distilled spirits are sold, manufactured, kept for sale or bartered, and is further vested with the power and charged with the duty of having such place, and all such liquor, and all property kept and used in maintaining such place, declared a public and common nuisance, and abated as such in a suit to be brought by him in equity, and the persons concerned in conducting the same, enjoined and restrained from conducting or permitting the continuance of said described nuisance, and enjoined and restrained from manufacturing, selling, bartering or storing any of said distilled spirits, and is further vested with the power and charged with the duty

of subjecting to a lien the property of any person, which is used or occupied to the knowledge of the latter in violation of the provisions of said act, in the amount of all fines and costs assessed against the occupant thereof, for all such violations and to cause such property to be sold therefor, and is further vested with the power and charged with the duty of prosecuting any person who manufactures distilled spirits contrary to the expressed provisions of said acts of Congress."

Upon the question of fact, whether demobilization has occurred and whether, if the fact be, it has been proclaimed by the President, the bill, which, as stated, is not denied, pleads that the President, in his message vetoing the Volstead Act, among other things said:

"The subject-matter treated in this measure deals with two distinct phases of the prohibition legislation. One part of the act under consideration seeks to enforce war-time prohibition. The other provides for the enforcement which was made necessary by the adoption of the constitutional amendment. I object to and cannot approve that part of this legislation with reference to war-time prohibition. It has to do with the enforcement of an act which was passed by reason of the emergencies of the war, and whose objects have been satisfied in the demobilization of the army and navy, and whose repeal I have already sought at the hands of Congress. Where the purposes of particular legislation arising out of war emergency have been satisfied, sound public policy makes clear the reason and necessity for repeal."

Other facts of current history are in the case, through the petition, affidavits, or judicial notice—e. g., the date of the armistice with the Central Powers; the fact of the signing on the part of the latter of a treaty of peace with the Allies: the fact that a large majority of the chief powers of the latter (in fact, all except the United States) have already ratified such treaty; that the Congress adjourned its extra session without ratification of the treaty of peace, which had been lying before the Senate for many months; whether a state of actual war now exists, as contradistinguished from the mere fiction of existing war, arising from the failure of the Senate to take affirmative action—all these things and many more of like character may be judicially noticed.

The fact, shown by affidavit and not denied, that Congress had with predetermined foresight, and in a spirit of fairness, set forward the taking effect of national prohibition under the provisions of the Eighteenth Amendment by providing a year of grace for business adjustment, now, unfortunately for plaintiffs, cut short by the War Prohibition Act, is of sentimental value only. It may aid the argument, but it cannot materially affect the law; this for the reason that the Eighteenth Amendment does not in express words guarantee a year of grace. It merely has the effect to give it, by providing that this amendment shall be in force one year after its ratification by a constitutionally sufficient number of states.

I do not think that the words "conclusion of the present war," as used in the War Prohibition Act and in the Volstead Act, are modified by, or dependent upon, any proclaiming of the end of the war by the President. War is declared by Congress perforce the organic law; but in this connection it is interesting to note that, while Congress has power to declare war, a state of war—i. e., war in fact, and therefore in law—does not depend on the making of a declaration of war.

261 F.—41

Actual hostilities may fix the time of the beginning of war, although no proclamation of war was issued, no declaration of war made, and no action taken thereon by the legislative branch of government. The Panama, 176 U. S. 535, 20 Sup. Ct. 480, 44 L. Ed. 577; The Buena Ventura, 175 U. S. 384, 20 L. Ed. 148, 44 L. Ed. 206; Baker v. Gordon, 23 Ind. 204. Surely it is at least conceded that war is ended when a treaty of peace is made, signed, and ratified by the Senate, whether any proclamation of such conclusion of the war is ever made by the President or not. I do not concede, for the purpose of this discussion, except within certain limits, that the ratification of a treaty of peace is an absolute condition precedent to peace. It may be of official peace, as distinguished from a state of peace, or of peace in fact. Certainly with the coming of peace in fact, looking now to this single phase of the case, the reason for war prohibition failed. Should not the law, concededly unconstitutional, except as a war measure, fail also?

I think, then, since there was no reason in law for coupling up the fact of demobilization and requiring both of these facts to be proclaimed by the President before they should become official actualities, the proclaiming mentioned in the acts, supra, has no reference to the "conclusion of the present war." Neither, in my view, does the grammatical construction necessarily require such concatenation. If this view is correct, then it is evident that the President has already determined—that is, has satisfied himself from facts within his knowledge—that demobilization has terminated; for, referring to this identical point, he said in his message vetoing the Volstead Act, and with specific reference to that act, this:

"It has to do with the enforcement of an act which was passed by reason of the emergencies of the war, and whose objects have been satisfied in the demobilization of the army and navy, and whose repeal I have already sought at the hands of Congress."

No one at all conversant with the federal Constitution will be so bold as to deny the proposition that the power therein conferred on the Congress to prosecute either an offensive or a defensive war is, not only ex necessitate rei, but by the very terms of the Constitution itself, the supreme power, and the most far-reaching power which is conferred on Congress by the Constitution. The apposite language of the Constitution is that Congress shall have power "to declare war, * * * to raise and support armies * * * to make rules for the government and regulation of the land and naval forces, * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." Section 8, art. 1, Const. U. S. To this plain proposition the courts have ungrudgingly acceded. In the case of Northern Pacific Ry. Co. v. North Dakota, 250 U. S. loc. cit. 149, 39 Sup. Ct. 505, 63 L. Ed. 897, it was said: "The complete and undivided * * * war power of the United States is not disputable." This power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." Gibbons v. Ogden, 9 Wheat. 195, 6 L. Ed. 23. The only limitation existing (and this, it is obvious,

is in fact no limitation, for to so denominate it would constitute a con-tradiction in terms) is that legislation under this constitutional power must have a real and substantial relation to the purposes of the War. Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; Employers' Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297.

But the proposition is so self-evident as to render unnecessary any further consideration of it. Besides, counsel for plaintiffs with com-mendable candor concede that the act of November 21, 1918, was con-stitutional when it was passed; this is true perforce the power vested in Congress to wage war, the terms of which I set forth supra. The vexing question here is whether it is constitutional now.

If the World War is concluded, if demobilization has terminated, and if the latter fact has been determined and proclaimed by the Pres-ident, then there is no earthly doubt that the War Prohibition Act is unconstitutional, because it is a plain encroachment upon the police powers guaranteed by the federal Constitution to the several states.

The word "proclaim" means, in its usual and ordinary significa-tion, "to give wide publicity to; to make known by public announce-ment; to publish abroad; to disclose; to promulgate." Webster's Dictionary. Such meaning, and such only, is to be assigned to this word, unless there is something to indicate that it was used in the two acts supra in the technical sense, which means to make public an-nouncement by formal proclamation. If it has the latter meaning, it is clear that no such proclamation has been made by the President. If it means, as the word is used in these acts, merely announcing the fact in a public document, then such proclaiming of the fact of demo-bilization has been made by the President. In a number of acts pass-ed since the war began, which were intended to be merely temporary, and which provided for a restoration of the status quo ante by presi-dential act, it was specifically required that such official act should take the form of a formal proclamation (e. g., see Federal Control of Carriers Act, approved March 21, 1918; Control of Communication Act; Joint Resolution of July 12, 1918). Something of substance is to be argued from the very patent fact that by the language used in the War Prohibition Act no such formal or technical public announce-ment is clearly demanded.

Referring to the question whether it is a fiction of war or a state of war which is to be concluded, before the encroachment upon state's rights is to be abrogated, it ought to be within the power of a court of equity to look beneath a mere fictional status and find and decree the truth. In the deadly stress and exigency of war, private constitution-al rights and guaranties must be overridden and trampled upon, and many solemn provisions of the federal Constitution must rest in abey-ance, because the very life and existence of the government itself is in the balance. In such case the Constitution itself yields to the man-date of a higher law—the law of the struggle for existence. No pure democracy can successfully wage war. Successful wars are main-tainable only by an autocracy of greater or less degree, depending in their strictness upon the menace of the situation. A democracy con-

fronted by war must of necessity pro hac vice convert itself into an autocracy of a sort; for power must be centralized, constitutional guaranties stand in abeyance, and private rights largely cease, till the struggle for existence is at an end. But when the menace ceases to threaten, when the war is over, the reign of autocracy should cease, and the democracy ought to and must beat' back to its constitutional moorings, if free government under law is to endure among men.

I concede that it is settled law that, when Congress deals with a subject over which that body has power, it does not lie with the courts, in passing upon the validity of its acts, to inquire into or question the motives which actuated its action or nonaction. United States v. Des Moines, etc., Co., 142 U. S. 510, 12 Sup. Ct. 308; 35 L. Ed. 1099; Weber v. Freed, 239 U. S. 325, 36 Sup. Ct. 131, 60 L. Ed. 308, Ann. Cas. 1916C, 317. But the point here involved in my humble opinion cuts deeper than this. Here Congress has no power to act, except in the presence of conditions. Those conditions are that a state of war must exist. If there is no war, then there is no power to act. Must a court of equity, which largely owes its existence and usefulness to its power to sift truth from falsehood, and to look beneath the lid of things, and uncover and deal with otherwise hidden verities, stultify itself by saying there is war, when there is no war? If it is within the power of Congress to take away from the states rights which are vouchsafed to them by the Constitution, by the mere expedient of maintaining the fiction of war, when the reality has long ceased to exist, then such rights might indeed have short shrift. If such condition may continue in the teeth of the real fact for a year, it may continue for ten years, or indefinitely, and until such rights are forever lost, and the Constitution reduced to the status of a "scrap of paper."

Apparently some such view was held in mind by Foster, District Judge, in passing upon a similar case (Leiser v. Mooney), lately pending in the state of Louisiana, who said:

"Can Congress take advantage of an emergency and pass nation-wide legislation which in the ordinary course of events it would be without authority to pass, and then incorporate in that legislation a date to be determined by some one else, or a date determined of itself, and keep the law in effect that way when the emergency itself has ceased to exist, and consequently when the power of Congress to pass nation-wide prohibition has ceased to exist? Can they after fixing an event over which they have control, for the determination of certain legislation, then ignore that and adjourn, and so keep the legislation alive in contravention of the rights of the states? I do not think so. I think this War-Time Prohibition Act came to an end under every reasonable construction when the Congress adjourned without having rejected the peace treaty. The question of demobilization and the question of whether or not the war was at an end are questions of fact. I do not think Congress could deprive the courts of the right to determine those questions of fact by any clause incorporated in the bill. But, conceding that what they did was reasonable, it seems to me that it is now unreasonable."

In the view of Judge Foster I fully concur, but I take the view that, since the question of the constitutionality vel non of this matter is now pending before the Supreme Court of the United States, wherein a speedy decision will no doubt be reached, that I ought not to presume to express an opinion thereon. I have said so much merely to

accentuate my doubt of its constitutionality, and in order to show in a hurried way the divers ambiguities and lack of clearness in the law, as also the far-reaching consequences, upon any other view, by which this doubt is engendered. Griesedieck, etc., Co. v. Moore, supra.

But this case involves property rights of plaintiffs aggregating approximately half a million of dollars. Nearly half of this sum represents taxes paid in cash by the plaintiffs to the government on liquor which they cannot sell, if the act under discussion shall stand. Not only this cash payment, yet held in pocket by the government, but the whole value of this liquor, will, unless this injunction issue, be practically a total loss to plaintiffs; for, on account of reasons not necessary to take up space here to discuss, plaintiffs can neither export this liquor nor convert it into commercial alcohol without a result which amounts to confiscation of their entire outlay. In the face of this doubt and these compelling equities, and the falling short of the year of grace, fairness calls for the interposition of equity.

Something was urged against the right of plaintiffs to have an injunction staying the hands of public officers; this upon the view urged in argument that such enjoining of a public officer is in its effect tantamount to enjoining the government itself, which it is urged cannot be done. If this act is in fact invalid, for that it violates rights guaranteed to the several states, then it is difficult to see why an officer would have the power to enforce a law which is in fact no law. In such case an officer would in the last analysis stand in the attitude of a trespasser, or a mere intermeddler. Hammer v. Degenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724. The point turns, therefore, upon the other, relegated by me to the judgment of a higher court.

Let it there be decided, and pending such decision, and until some further order be made in the premises, let the motion to dismiss be overruled, and let a temporary injunction issue as prayed for in the petition.